**PICKER INTERNATIONAL CORPORATION,**
Plaintiff,

v.

**IMAGING EQUIPMENT SERVICES, INC., et al., Defendants.**

Civ. A. Nos. 87–2828–MLW, 87–2597–MLW.

United States District Court, D. Massachusetts.

July 5, 1995.

James S. Dittmar, James L. Messenger, Mark D. Robins, Hutchins, Wheeler & Dittmar, Boston, MA, for Picker International, Inc.

William J. Doherty, Morrison, Mahoney & Miller, Springfield, MA, for Bruce Leavitt.

Bruce Leavitt, Mansfield, MA, pro se.

Richard C. Heidlage, Kelly L. Wilkins, Heidlage & Reece, Boston, MA, William West, Stokes & Bartholomew, Nashville, TN, for Imaging Equipment Services, Inc.

Richard C. Heidlage, Heidlage & Reece, Boston, MA, for Thomas J. Quinn.

## MEMORANDUM AND ORDER

WOLF, District Judge.

### I. SUMMARY

Plaintiff Picker International Corporation ("Picker") designs, manufactures, sells, and services medical diagnostic equipment including the computed tomography scanners ("CT Scanners") involved in this case. Defendant Imaging Equipment Services, Inc. ("Imaging") is an independent servicing organization ("ISO") which competes with Picker to service Picker produced CT Scanners. Defendant Thomas J. Quinn is the founder and President of Imaging.

Picker initiated this action in 1987, in the United States District Court for the Western District of Pennsylvania, alleging that Imaging and Quinn had misappropriated Picker's trade secrets and violated its copyrights in the course of competing to service Picker Synerview CT Scanners. Picker initially sought both damages and injunctive relief.

Later in 1987, Picker filed suit in this court against Imaging and Bruce Leavitt, a former Picker employee who had been hired by Imaging, for Leavitt's alleged breach of his agreements not to compete with Picker or misappropriate Picker's confidential business information. Once again, Picker originally sought both damages and injunctive relief.

On February 13, 1989, the parties agreed to a Partial Final Injunction restraining Imaging from using the voluminous Picker documents and software Leavitt had brought to Imaging after terminating his employment with Picker.

The case filed in Pennsylvania was transferred to this court. Imaging responded to Picker's actions by filing counterclaims alleging that Picker had violated federal anti-trust laws and various state laws in an illegal effort to monopolize the market for the servicing of its CT Scanners. The progress of these cases was twice stalled by Imaging's filing for bankruptcy and the automatic stay of litigation those filings generated. In 1994, Picker obtained relief from the automatic stay by waiving its claims for damages and agreeing to seek only injunctive relief in this case.

In August 1984, the court granted Picker's motion for summary judgment on defendants' counterclaims. *Picker International, Inc. v. Leavitt*, 865 F.Supp. 951 (D.Mass. 1994). Soon after Leavitt settled with Picker, admitting that he had misappropriated Picker's confidential business information and agreeing to injunctive relief.

A non-jury trial, lasting several weeks, was conducted in September and October 1994. The court took the case under advisement. Imaging and Quinn submitted two motions to re-open the trial. After a hearing on June 5, 1995, those motions were denied.

After carefully considering the evidence, including the credibility of the witness, the court finds that Quinn and Imaging have for more than a decade engaged in a relentless and extensive campaign to misappropriate Picker's legally protected intellectual property. The court also finds that defendants' misconduct continued through trial in the form of testimony fabricated by Quinn.

Accordingly, the court is issuing an Order which, among other things, requires that Quinn and Imaging return to Picker or destroy the Picker trade secrets, copyrighted materials, and confidential information they misappropriated, and enjoins the defendants from violating in the future Picker's rights to control the dissemination and use of its legally protected intellectual property. In view of the pervasive and enduring misconduct of defendants, and of the nature of the relief ordered, the court is appointing James A. Ring, a former Special Agent of the Federal Bureau of Investigation, to serve as a Monitor to supervise and ensure compliance with the court's Order.

The reasons for these decisions are set forth in detail in this Memorandum.

### II. THE GENERALLY APPLICABLE LAW

The following Findings of Fact and Conclusions of Law may be best understood in the context of the generally applicable law. While Picker relies on several legal theories, the essence of its allegations is that Imaging and its President, Quinn, systematically misappropriated and misused Picker's trade se-

crets relating to the servicing of Picker CT Scanners. The parties have stipulated that the law of Massachusetts may be applied in analyzing this claim.

■ There are six factors which are usually considered in determining whether information constitutes a trade secret:

1. The extent to which the information is known outside the plaintiff's business;

2. The extent to which it is known by employees and others involved in the plaintiff's business;

3. The extent of measures taken by the plaintiff to guard the secrecy of the information;

4. The value of the information to the plaintiff and to its competitors;

5. The amount of effort or money expended by the plaintiff in developing the information; and

6. The ease or difficulty with which the information could be properly acquired or duplicated by others.

See Restatement of Torts § 757, comment b (1939); USM Corporation v. Marson Fastener Corporation, 379 Mass. 90, 98–99, n. 9, 393 N.E.2d 895, 900, n. 9 (1979); Data General Corporation v. Grumman Systems Support Corporation, 825 F.Supp. 340, 357 (D.Mass. 1993), aff'd, 36 F.3d 1147, 1165 (1st Cir.1994).

■ At the heart of this case is the third factor—the question whether Picker took adequate measures to protect what it now characterizes as its trade secrets. It is axiomatic that: "One who possesses a trade secret and wishes to protect it must act to preserve its secrecy." USM Corporation, 379 Mass. at 97, 393 N.E.2d at 899–900. It is not necessary, however, that an "'impenetrable fortress'" be erected to retain legal protection for a trade secret. Id. (quoting E.I. duPont de Nemours & Co. v. Christopher, 431 F.2d 1012, 1017 (5th Cir.1970), cert. denied, 400 U.S. 1024, 91 S.Ct. 581, 27 L.Ed.2d 637 (1971)). Rather, reasonable security precautions are required. Id.

■ In determining whether reasonable security precautions have been taken:

"Relevant factors to be considered include (1) the existence or absence of an express agreement restricting disclosure, (2) the nature and extent of security precautions taken by the possessor to prevent acquisition of the information by unauthorized third parties, (3) the circumstances under which the information was disclosed ... to (any) employee to the extent that they give rise to a reasonable inference that further disclosure without the consent of the possessor is prohibited, and (4) the degree to which the information has been placed in the public domain or rendered 'readily ascertainable' by the third parties through patent applications or unrestricted product marketing."

Id. at 98, 393 N.E.2d at 900 (quoting Kubik Inc. v. Hull, 56 Mich.App. 335, 356, 224 N.W.2d 80, 91 (1974)). In essence, what is reasonable depends on the circumstances of each case, considering the nature of the information sought to be protected as well as the conduct of the parties. Id. at 101, 393 N.E.2d at 902. Thus, as circumstances, including the foreseeable risk to information a party deems confidential, change the definition of the security precautions reasonably necessary to protect it may also change.

■ Significantly for this case, in deciding whether to grant a plaintiff the protection it seeks, "a court should consider the relationship and conduct of the parties," and "it [is] appropriate to balance a plaintiff's conduct in maintaining its security measures against the conduct of a defendant in acquiring the information." Id. at 98, 393 N.E.2d at 900. Indeed, while a matter may not constitute a trade secret, it may be entitled to protection as confidential business information "against one who improperly procures such information. The law puts its imprimatur on fair dealing, good faith, and fundamental honesty. Courts condemn conduct which fails to reflect these minimum accepted moral values by penalizing such conduct whenever it occurs." Id. at 104, 393 N.E.2d at 903; see also CVD, Incorporated v. Raytheon Co., 769 F.2d 842, 850 (1st Cir.1985), cert. denied, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986) ("trade secret law is intended to maintain and promote standards of commercial ethics and fair dealing").

■ This case also involves questions of federal copyright law, which proscribes the unauthorized reproduction and distribution of copyrighted works. 17 U.S.C. § 106. Implicated too is the common law prohibition against conversion by unauthorized use of the property of another. *See e.g., Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir.1993).[1]

Fundamentally, however, this is a case in which Picker made reasonable efforts to protect its trade secrets, copyrighted materials, and confidential business information. Those efforts evolved over time to meet the escalating threat to Picker's proprietary information posed by the changing industry for the servicing of CT Scanners. Quinn and Imaging, however, engaged in a relentless campaign to misappropriate and misuse Picker's trade secrets, confidential business information, and copyrighted materials. The defendants also persistently attempted to cover-up their misconduct. That effort continued through trial. In these circumstances, Picker is entitled to substantially all of the relief it is seeking.

## III. *FINDINGS OF FACT*

Having considered the direct and circumstantial evidence presented at trial, and assessed the credibility of the witnesses, the court finds the following facts to be proven by a preponderance of the evidence.

Picker is a New York corporation with its principal place of business in Highland Heights, Ohio. It manufactures, sells and services medical diagnostic imaging equipment, including CT Scanners.

Imaging is a Pennsylvania corporation, with its principal place of business in Pittsburgh. It was formed in November, 1984, and commenced its business in January, 1985. Thomas J. Quinn has been involved with Imaging since its inception. He is now its President and largest shareholder. Imaging is an ISO, which competes with Picker for the opportunity to maintain and repair CT Scanners sold by Picker.

A CT Scanner is a complex, diagnostic imaging system that utilizes computed tomography and x-ray technologies. It produces images of a cross-section of an area of a human body. It is, therefore, often more valuable than a conventional x-ray for diagnosing disease or injury.

Picker entered the then new CT Scanner market in the mid–1970's. At all times relevant to this case, Picker has competed with other manufacturers for the sale of CT Scanners. Picker's technology, like that of its competitors, has evolved over time.

In 1982, Picker introduced its Synerview 600 and 1200 CT Scanners, which were in the industry regarded as the fourth generation of CT scanning technology. Depending on the features selected, a Synerview 600 CT Scanner cost between $600,000 and $800,000, and a Synerview 1200 CT Scanner cost between $800,000 and $1,100,000. The Synerview CT Scanners were Picker's most successful product. There are about 75 Synerview 600 CT Scanners and 525 Synerview 1200 CT Scanners still in operation in the United States today. CT Scanners are usually utilized in the United States for eight to ten years, when they are typically replaced by more advanced technology. If properly maintained and repaired, however, a CT Scanner will not wear out.

The maintenance and repair of CT Scanners is of vital importance to purchasers. A high quality image is essential to the function CT Scanners perform. Reliability is valued because the CT Scanners are employed for emergency procedures and are also often scheduled for use many hours a day, for up to seven days a week, to maximize their

---

1. Picker did not include in its Complaint a count alleging conversion. It did, however, inform the defendants and the court of its desire to seek relief on this basis before trial. The evidence at trial established, among other things, that defendants used without authorization, and thus converted, certain personal property of Picker, particularly its proprietary service manuals. In these circumstances, it is appropriate to permit an amendment to the pleadings to include Picker's claim for conversion in order to conform to the evidence. *See* Fed.R.Civ.P. 15(b); 6A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 1491, at 4–5 (1990). Defendants are not prejudiced by this amendment in part because this theory merely provides another ground for Picker to prevail with regard to its proprietary service manuals.

profitability. Picker's CT Scanners require routine maintenance of several hours to a day each week, and emergency diagnosis of problems and repairs is commonly needed. The cost and quality of service is a factor customers consider in deciding whether to buy a CT Scanner from Picker or one of its competitors. Such service is expensive, at times exceeding the purchase price of the CT Scanner over an eight to ten year period.

Picker sold its Synerview CT Scanners with a warranty which provided free service for one year. At the expiration of the warranty period, Picker offered a series of service options, including providing maintenance and repairs for a fixed fee or on a time and materials basis. In 1982 and 1983, a few customers had in-house service engineers. In that period the vast majority, however, relied on Picker to service the CT Scanners it had sold.

Picker invested a great deal of time and money in developing the software and documents necessary to maintain and repair its Synerview CT Scanners. This software and documentation was designed to permit Picker to perform tests to determine whether its CT Scanners were operating properly. The service documents and diagnostic software enable Picker to engage in efficient preventive maintenance, to identify the cause of any malfunction quickly, to repair any problem promptly, and to replace any components not functioning properly.

Picker's service materials fall into four general categories: (i) diagnostic computer software designed to enable its user to determine whether the CT Scanner or its components are operating according to specifications and to isolate malfunctions; (ii) technical bulletins and service engineering notes designed to enable their user to better install upgrades and modifications and to better test, troubleshoot and repair the CT Scanners; (iii) service manuals designed to enable their user to maintain, troubleshoot and repair CT Scanners more quickly and reliably; and (iv) classroom training materials designed to provide instruction concerning the general theory and operation of a CT Scanner, and the techniques for maintenance and repair.

Picker has since the early 1980's designed several new generations of diagnostic software, which it makes available to its field service engineers to enable them to test CT Scanner performance and identify malfunctions rapidly.

Picker has also periodically prepared and distributed to its field service engineers service engineering technical bulletins and technical notes. These service engineering bulletins and notes detail new and improved service techniques for the maintenance and repair of CT Scanners and instruct field service engineers concerning equipment modifications to enhance the performance and safety of CT Scanners.

Picker also has developed or compiled service manuals for its CT Scanners and each major system component. These manuals provide information on CT Scanner design and describe maintenance, troubleshooting, and repair techniques. The average set of service and repair manuals comprises more than sixty volumes and takes up three feet of shelf space. Because of their bulk these manuals are not, as a practical matter, portable. In order to ensure availability for service when the customer needs it, Picker often stores its service and repair manuals in the radiology suite of each customer site where Picker is providing service. Storing the manuals at the customer site benefits the CT Scanner owner and its patients because it greatly enhances Picker's ability to provide the customer with the prompt and reliable service which this type of medical equipment requires. Each set of service manuals is uniquely suited to serve as a reference for the maintenance and repair of the corresponding CT Scanner because CT Scanners vary from one another depending on their vintage, upgrades and the options selected by the customer.

Picker has also developed classroom training materials, including information on the theory and operation of the CT Scanner. These classroom training materials enhance the ability of field service engineers to service and repair CT Scanners and enable them to begin providing accurate and reliable service at an early stage of their career.

Picker spends more than one million dollars per year to develop and update its diagnostic software, service engineering technical bulletins and notes, service manuals and classroom training materials concerning its CT Scanners.

As indicated earlier, in 1982 and 1983 virtually all Synerview CT Scanners were serviced by Picker employees. A few customers, however, utilized in-house engineers to provide service after Picker's warranty expired.

In 1982 and 1983, Picker had a long established and published policy requiring that employees not disclose "proprietary" or "confidential" information without the authorization of the company. To implement this policy, as consideration for employment and training, each Picker service engineer was required to execute a confidentiality agreement. That agreement provided, among other things, that the employee would not at any time, without Picker's written consent, disclose any "secret" or "confidential" information acquired in the course of his or her employment, and would return to Picker all manuals and other materials provided by Picker upon the termination of his or her employment.

Picker trained its service engineers concerning the installation, maintenance and repair of its CT Scanners. Such training took several months and was provided at a facility dedicated to training. The facility was not accessible to the public or to Picker employees who did not have a legitimate business reason to be there. There was a security guard at the entrance. Picker employees authorized to enter the training facility wore identification badges. Authorized guests also wore passes. Picker training materials were kept in a caged area, and were usually accessed only by an individual employed by Picker. In 1983, at the outset of their training, the students were reminded that some of the information they would be receiving was confidential and that they had an obligation to protect it.

In 1981, Picker sold one of the first Synerview 1200 CT Scanners to C.A.T. Associates, for delivery in 1982. C.A.T. Associates was an entity formed by Drs. Joseph Marasco, Jr.

and Thomas Pittman, radiologists who were associated with St. Francis Hospital in Pittsburgh, Pennsylvania. The Synerview CT Scanner was installed at St. Francis Hospital, and it was C.A.T. Associates intent to later transfer ownership of the equipment to the Hospital. At the time the sale was negotiated, Picker agreed to C.A.T. Associates' request that Quinn be trained to service the Synerview 1200 CT Scanner on C.A.T. Associates' behalf. C.A.T. Associates had Quinn made an employee of St. Francis Hospital so he would not be prejudiced with regard to seniority when ownership of the Synerview CT Scanner was transferred to St. Francis Hospital. Picker, however, was not informed of this arrangement. Rather, prior to 1985, Picker regarded Quinn as an employee of its customer, C.A.T. Associates. Picker's belief that Quinn was employed by C.A.T. Associates was reasonable. Indeed, in his initial deposition Quinn repeatedly testified that he had been employed by C.A.T. Associates.

Picker's contract of sale with C.A.T. Associates included the following then standard Picker provisions:

10. *DATA RIGHTS* No rights to any intellectual property residing in the Equipment, software, documentation, or any data furnished hereunder are granted except the right to use such intellectual property. Customer will use the same standard of care to protect Picker's confidential information as it uses to protect its own confidential information. Customer recognizes that, among other things, computer software necessary to the operation of the Equipment is confidential information belonging to Picker or to third parties to whom Picker is under an obligation not to disclose confidential information except to certain authorized parties, of whom Customer is one. Customers shall have no right to copy, reproduce or disclose to others in whole or in part any of the above without the prior written permission of Picker.

11. *TRANSFER OF PICKER'S CONFIDENTIAL INFORMATION UPON RESALE OF EQUIPMENT.* In the event that Customer resells the Equipment, Picker warrants that it will permit custom-

er to transfer Picker's confidential information, which it has provided to customer and which is necessary to operate the Equipment, to its resale customer provided, however, that such resale customer first agrees to protect the confidentiality of such information upon reasonable terms and conditions and upon the payment to Picker of a reasonable fee for the transfer of such confidential information.

August 3, 1981 Picker Quotation to C.A.T. Associates, Trial Exhibit 54. Quinn was familiar with this contract of sale by virtue of his roles in advising C.A.T. Associates concerning its negotiation and in participating in the installation of the Synerview CT Scanner at St. Francis Hospital. The foregoing provisions informed Quinn, among others, that: Picker viewed some of the documents and software being sold for use in operating the CT Scanner as its proprietary, confidential information; that the customer had only the right to use that information in connection with the operation of the CT Scanner it had acquired; and that the customer and those acting for it had no right to reproduce or disclose such information to any other entity or individual without Picker's prior, written authorization.

The foregoing, standard provisions of the C.A.T. Associates contract of sale do not refer to any documents or software concerning the maintenance and repair of the Synerview CT Scanner because none were sold to C.A.T. Associates. Rather, while Picker in 1981 sold C.A.T. Associates the information necessary to operate the Synerview CT Scanner, it did not sell it the documents and software necessary to service it. It was Picker's practice in 1981 and 1982 to ship service manuals and diagnostic software, which contained some items identified as Picker's proprietary confidential information, and which Picker continued to own, with the

Synerview CT Scanner, for use by Picker service engineers in maintaining and repairing that particular device. In negotiating the contract to sell a Synerview 1200 CT Scanner to C.A.T. Associates, Picker agreed to permit Quinn to participate in its servicing and to use Picker's manuals and software to do so. At all times prior to January 1985, however, Picker reasonably regarded Quinn as an employee of C.A.T. Associates, who was subject to the Data Rights restrictions in the contract of sale, and who would use Picker's service manuals and software only to service the single C.A.T. Associates CT Scanner at St. Francis Hospital.[2]

In 1982, Quinn had meaningful experience with computers and with CT Scanners. He had worked for Burroughs Corporation providing computer services for the banking industry. Quinn later worked for a competitor of Picker, Pfizer Corporation, servicing its CT Scanners, including one installed at St. Francis Hospital. This experience led to his association with C.A.T. Associates.

As contemplated when C.A.T. Associates purchased the Synerview 1200 CT Scanner, Quinn worked with Picker personnel to install it at St. Francis Hospital and to maintain it during the warranty period, which ran until September or October 1983. C.A.T. Associates was pleased with the quality of the Synerview 1200 CT Scanner, but expressed concern about the servicing of it. C.A.T. Associates wrote to Picker, however, that this could be made "less of a concern by having *our* own field service engineer, Mr. Thomas Quinn, receive appropriate instruction on servicing the unit," as had been promised when the sale was negotiated (emphasis added). October 28, 1992 Letter from Dr. Joseph A. Marasco, Jr. to Walter Zukowski, Trial Exhibit 55. Thus, Quinn was of-

---

**2.** Following trial, defendants brought to the court's attention for the first time a Picker May 14, 1983 Memorandum which suggests that up to that date Picker had been selling its proprietary service information to customers with its CT Scanners. There was no testimony at trial concerning this document. The witnesses who testified for Picker asserted that Picker did not sell its proprietary service information, although it did at times sell a separate set of customer service documents which did not include Picker's proprietary documents and software. In any event, the evidence is insufficient to establish that Picker sold its proprietary service documentation and software to C.A.T. Associates. Moreover, there is no evidence suggesting that Picker ever authorized the transfer of any documentation or software from C.A.T. Associates or St. Francis Hospital to Quinn individually or to Imaging.

fered the training that Picker provided its own field service engineers.

Quinn's training, for which C.A.T. Associates paid, was scheduled for the early summer of 1983, at the Picker training center in Ohio. The standard Picker training course involved three levels of instruction. Because he felt that the first level course was too basic for someone with his experience, Quinn did not attend it. Thus, he was not present when the instructor reminded the students that some of the information they would receive was confidential to Picker and had to be protected as such. Nor was Quinn required to sign a confidentiality agreement. Rather, he was one of about 30 in-house service engineers employed by Picker customers who were trained by Picker before it instituted the requirement that they each sign a confidentiality agreement to supplement the Data Rights restrictions contained in Picker's standard contract of sale.

Quinn did, however, know that he was being trained by Picker to work on the Synerview 1200 CT Scanner installed at St. Francis Hospital; that the training was conducted in a secure facility, which was accessible only to certain Picker employees and a small number of other authorized individuals; and that training materials were kept in a caged area and usually distributed to authorized recipients by a Picker employee. He also knew that he was being treated, in essence, like a Picker field service engineer because he was viewed by Picker as a trusted partner in providing service for the Synerview CT Scanner installed at St. Francis Hospital.

Although it eventually became evident that Picker's trust in Quinn was misplaced, it was reasonable in 1983. When Quinn was trained, there were few ISOs in the medical industry generally, and none competing for the servicing of Synerview CT Scanners. The ISOs offering service for other medical devices were founded by former employees of their manufacturers; it appears that none had been started by in-house service engineers trained by manufacturers.

Quinn attended several months of level two and three Picker training, but did not fully participate. Because he declined to take ex-

ams or engage in certain exercises, he was not deemed by Picker to have completed the training successfully. He was, however, provided considerable information and voluminous documentation, which he supplemented by taking extra copies from the caged area when the attendant was absent. As part of his training, Quinn received certain service manuals and training materials, including the 1983 edition of the X–Ray Control Manual, the 1983 edition of the Installation Manual, the 1983 edition of Schematic Drawings, SS1200 (operating) Software Manual, CRT Perkin Elmer User's Guide, and the High Speed Starter Guide. At the time of Quinn's training, the binders in which these materials were provided did not designate them as "confidential" or as "proprietary" information of Picker. However, some of the documents—particularly those relating to software documentation—were marked as proprietary to Picker, with legends stating they could not be copied, disclosed or used without the express written permission of Picker.

It was expensive and time-consuming for Picker to develop many of the materials Quinn received in training. For example, the 1983 edition of the Schematic Drawings, which were prepared by Picker design and manufacturing engineers, took about five man-years to develop. All of the materials Quinn obtained in training had considerable commercial value to Picker because they enabled its employees and authorized others to efficiently and effectively diagnose and correct difficulties for customers who put a premium on reliability and minimizing "downtime." Those materials also permitted Picker to minimize repair costs by precisely identifying any malfunctions. Most of the software and documentation created by Picker, based upon its experience developing its own CT Scanners, could not as a practical matter be duplicated by ISOs or others. Picker never sold items such as the SS1200 Software Manual, many parts of which were designated as Picker proprietary information, the CRT Perkin Elmer User's Guide, and the High Speed Starter's Guide to the general public or, when they emerged, to Picker's competitors. Picker rightly regarded the materials Quinn re-

ceived in training to be the property of C.A.T. Associates. C.A.T. Associates understood it had sold them to St. Francis Hospital when ownership of the Synerview 1200 CT Scanner was transferred to the Hospital.

Quinn testified at deposition and at trial that he was given Picker's DSO2 diagnostic software in the course of his training in Ohio and again by Picker employees during the period the C.A.T. Associates CT Scanner was under warranty. This testimony is not credible. Quinn's training ended in August 1983. The warranty on the CT Scanner installed at St. Francis Hospital expired no later than October 1983. DSO2, however, was not developed by Picker until late October 1983, and was not released to its field service engineers until January 1984. Thus, Quinn did not receive it in training or from Picker employees while working with them when the C.A.T. Associates CT Scanner was under warranty. The diagnostic software Quinn encountered in training and while the CT Scanner at St. Francis Hospital was under warranty was DSO1, the manual for which had a Picker proprietary legend.

DSO2 was the second generation of Picker's diagnostic software for its Synerview CT Scanners. It contained 152 programs containing diagnostic tests. Picker authored 95 of the tests. The remaining 57 tests were developed by the Perkin Elmer Corporation, the manufacturer of the computer system used in the Picker CT Scanner. Picker incorporated its tests and Perkin Elmer's tests into a unique program capable of servicing the entire Synerview CT Scanner system. Picker also developed a manual of its materials and materials prepared by Perkin Elmer, which is essential to the use of DSO2.

It took Picker about three man-years to develop the first generation of its diagnostic software, DSO1, and the manual for it. It took another one and one-half man-years to develop DSO2 and its manual. Comparable investments were needed to develop the next generations of diagnostic software, DSO3 and DSO4, and their manuals.

As indicated earlier, Picker's diagnostic software and manuals are very important to its business. Customers put a premium on minimizing "downtime," and diagnostic software is an invaluable tool in any effort to do so. As a practical matter, it would not be feasible for anyone else to develop comparable diagnostic software and manuals for the Synerview CT Scanner.

At the time DSO2 was developed there were no ISOs competing with Picker to service Synerview CT Scanners. In contrast to its successor, DSO3, the DSO2 software did not have a proprietary legend displayed on the computer screen or a lockout mechanism. The software documentation for various DSO2 tests each included in the manual, however, contained the following legend:

> THIS DOCUMENT CONTAINS PROPRIETARY INFORMATION. IT IS THE EXCLUSIVE CONFIDENTIAL PROPERTY OF PICKER CORPORATION. COPYING, DISCLOSURE TO OTHERS, OR OTHER USE IS PROHIBITED WITHOUT THE EXPRESS, WRITTEN AUTHORIZATION OF PICKER CORPORATION.

DSO2 Service User's Guide, Section VI, Trial Exhibit 77H. DSO2 was provided to Picker field service engineers in January 1984. It was also evidently available for use by those customers who employed in-house engineers, subject to the restrictions imposed by the standard terms of the contracts for sale and by the foregoing proprietary legends on the software documentation.

In late 1983, Picker anticipated the emergence of ISOs as competitors for the servicing of its Synerview CT Scanners. It, therefore, began to take additional measures to protect what it considered to be its trade secrets and confidential business information. For example, in about late 1983 or early 1984 Picker began placing all of its service manuals in binders with prominent legends declaring the information they contained to be proprietary and notifying the recipients that such information could not be copied, disclosed or used without Picker's permission. Picker also then began to place copyright notices and proprietary legends on the cover of its service manuals and certain other documents.

In addition, in March 1984, Picker issued a memorandum reminding all employees of

their obligation to protect specified forms of trade secrets and confidential information, and again directing them not to disclose such information without written permission. At about the same time, in return for training and continued employment, Picker required its employees to execute another confidentiality agreement, which explicated their obligation to return all Picker materials to the company upon the termination of their employment and prohibited them from competing for the servicing of CT Scanners they serviced for Picker during the year after their departure. This agreement was supplemented by a new termination agreement which called upon the departing employee to certify that he or she had returned all Picker property and to reaffirm recognition of the obligation to maintain the secrecy of Picker confidential information.

In late 1983, Picker also began conducting separate training programs for customer in-house service engineers. Those classes provided instruction only in basic service technologies. The trainees received only limited documentation, not including much of the proprietary materials that Picker provided its own employees. Beginning in 1985, customer employees receiving classroom training were required to execute confidentiality agreements.

The first ISO to offer service in competition with Picker for its Synerview CT Scanners was R[2] Corporation, which was formed in February 1984. Picker promptly perceived that R[2] Corporation was improperly using its intellectual property and filed suit. That litigation was settled. The settlement did not permit R[2] to use DSO2, among other things. When the media reported in 1992 that R[2] Corporation was using DSO2, R[2] responded to a demand from Picker by reaffirming that it was not using DSO2, and would not do so.

Imaging was formed in November 1984 as the second ISO to offer, among other things, service for Synerview CT Scanners. C.A.T.

Associates was a principal shareholder of Imaging. Quinn, who declined an opportunity to work full-time servicing the various CT Scanners at St. Francis Hospital, became the principal employee of Imaging when the company became operational in January 1985. As Imaging acquired additional employees, it required them to sign agreements with confidentiality clauses similar to Picker's.

From its inception, Imaging's capacity to service Picker Synerview CT Scanners has been based on the misappropriation of Picker's intellectual property. After Imaging was established, Quinn moved to Imaging's office all of the Picker service and repair manuals and classroom training materials that had been furnished to him as a representative of C.A.T. Associates for the servicing of the one Synerview CT Scanner at St. Francis Hospital. Those documents were the property of C.A.T. Associates or St. Francis Hospital, neither of which obtained the permission of Picker required by the Data Rights provision of the contract of sale before any disclosure to another entity, such as Imaging, could properly be made. Dr. Morasco viewed the documents as the property of St. Francis. However, Quinn kept them for Imaging's use at other sites when it lost its contract to service the Synerview CT Scanner at St. Francis Hospital to Picker in 1986.

Imaging, in some unauthorized fashion, obtained a copy of DSO2 and used it in its business, which initially consisted primarily of the contract it had to service the CT Scanner at St. Francis Hospital.[3] Imaging knew that Picker had sued R[2] Corporation to prevent it from using DSO2, and did not want to risk litigation which could have been fatal to its fledgling business. Picker, in turn, did not wish to risk its relationship with St. Francis Hospital, which it correctly viewed as a future customer for its CT Scanners and post-warranty service business. Thus, Picker and Imaging, each receiving valuable consideration, entered into a limited Licensing Agreement. *See* March 25, 1985

---

**3.** As indicated earlier, Quinn's testimony that he received DSO2 from Picker in training and while the Synerview CT Scanner was being installed at St. Francis Hospital is not credible. There is no credible evidence establishing how he acquired DSO2 before Picker licensed Imaging to use DSO2 at St. Francis Hospital in August 1985. The court believes that Quinn fabricated his testimony concerning his acquisition of DSO2.

License Agreement for Service Diagnostic Software, including Addendum, Trial Exhibit 83. The Licensing Agreement allowed Imaging to use DSO2, without payment to Picker, to service the Synerview Scanner at St. Francis Hospital. In return, Imaging acknowledged that DSO2 was "the exclusive property of Picker and agree[d] to treat [DSO2] as confidential, proprietary information of Picker." *Id.* at ¶ 1.2. Imaging also undertook to assure that its employees would not copy DSO2, disclose it to others, or use it anywhere except at St. Francis Hospital without the written consent of Picker. The agreement provided that the license would expire when DSO2 was no longer being used by Imaging at St. Francis Hospital.

Although Imaging agreed to the terms of the Licensing Agreement, it did so reluctantly. Imaging wanted to use DSO2 at sites in addition to St. Francis Hospital. Thus, it had included in the Licensing Agreement a provision allowing it to use DSO2 at other sites if Picker did not reasonably object; if Picker registered a reasonable objection, Imaging agreed not to use DSO2 at the site at issue.

Imaging made several requests to use DSO2 at additional sites, both before and after the January 1986 termination of its service contract for the Synerview CT Scanner at St. Francis Hospital, which operated to end the Licensing Agreement. In each instance Picker reasonably objected. Nevertheless, Imaging copied DSO2 and used it at virtually all of the more than 15 sites it serviced. In connection with this, Imaging also copied and distributed to its employees Picker's DSO2 User's Guide, after removing the page with the Picker proprietary legend.

In correspondence between counsel after January 1986, Imaging repeatedly contended that it had a right under the Licensing Agreement to use DSO2 at sites other than St. Francis Hospital. Imaging did not then claim, however, that DSO2 was not Picker's proprietary, confidential information. In 1987, Picker sued Imaging in the United States District Court for the Western District of Pennsylvania. That case was transferred to this court. At the commencement of trial, Imaging stipulated that Imaging and

Quinn had no right under the Licensing Agreement to use DSO2 after January 1986. Defendants now contend, however, that it was proper for them to use DSO2 because DSO2 did not constitute Picker proprietary information or a trade secret, and was not registered with the United States Registrar of Copyrights.

Imaging also obtained the next generation of Picker's diagnostic software, DSO3, and the experimental version of it, DSX3. It appears that Imaging initially obtained this software from Picker customer sites, including the Monsour Hospital in Pittsburgh, Pennsylvania and Physicians Medical Imaging in Youngstown, Ohio. It took Picker about one and one quarter man-years to develop DSO3. When it was released in late 1984 or early 1985, ISOs were competing with Picker to service its Synerview CT Scanners. Thus, Picker utilized proprietary legends which appeared on the computer screen when DSO3 was run and a lockout mechanism intended to keep the software from being copied and used at other sites. The DSO3 manuals also contained Picker proprietary legends. Quinn knew that Picker was trying to protect DSO3. Nevertheless, Imaging used DSO3 whenever it could access it at sites where Picker had installed it, copied DSO3, and used it without the authorization of Picker.

Imaging also acquired a copy of the copyrighted 1984 edition of Picker's Service Reference Handbook, which Picker field service engineers used in servicing the Synerview CT Scanner. Pursuant to Picker policy, this document was not supposed to be sold or disclosed to anyone outside of Picker. It appears, however, that Imaging managed to buy a copy from Picker's parts department. That copy had a copyright notice on the front cover and title page. Imaging also took a copy of the Service Reference Handbook that Picker stored at Physicians Medical Imaging. Imaging removed pages of the Service Reference Handbook with the copyright notice and Picker proprietary legend, copied the rest of the document, and issued it to Imaging employees for use in servicing Synerview CT Scanners.

Similarly, Imaging acquired, from Monsour Hospital, the copyrighted 1985 edition of the Schematic Drawings of the Synerview CT Scanner. Like the earlier editions, these drawings were time-consuming and expensive to develop. They had considerable value to Picker, and to anyone seeking to compete with Picker to service Synerview CT Scanners. Once again, without Picker's permission, Imaging removed the pages containing Picker's copyright notice and proprietary legend, copied the 1985 edition of the Schematic Drawings, and distributed them for use by its employees.

Imaging also obtained the Picker's System Performance Test, which Picker field service engineers regarded as their "bible." This document is replete with Picker proprietary legends prohibiting their unauthorized copying, disclosure or use. Imaging, however, again removed the pages containing these legends, copied the remainder of the document, and distributed them for use by Imaging employees.

In addition, Imaging obtained the Picker Installation Manual, removed the front cover with the Picker proprietary legend, and distributed copies to its employees. With regard to this document, however, Imaging affixed its own stamp, stating: "PLEASE DO NOT COPY WITHOUT PRIOR APPROVAL OF IMAGING EQUIPMENT SERVICES, INC." Thus, Imaging not only utilized Picker's Manual, but sought to pass it off as its own.

While it is not clear how Imaging obtained all of the Picker materials it utilized, Quinn stole at least one item from a Picker employee. He was present when a Picker field service engineer was repairing a Synerview CT Scanner at the Forbes facility in Pennsylvania. The Picker employee left his briefcase behind when he left the radiology suite temporarily. Quinn removed a confidential Picker Technical Note, had it quickly copied, and replaced it before the field service engineer returned.

Imaging also regularly utilized many other documents which Picker regarded as its trade secrets, even though they did not have proprietary legends or copyright notice. Many of these were documents Quinn had

obtained from Picker while being trained to service the Synerview CT Scanner at St. Francis Hospital.

In 1987, Imaging improperly employed Bruce Leavitt, a former Picker employee, in part to gain access to Picker confidential information that Leavitt misappropriated when he left Picker. Leavitt began working for Picker in 1983, servicing its CT Scanners. At that time he signed the Picker standard confidentiality agreement, undertaking to use Picker's trade secrets only on behalf of Picker, and not to disclose them to third parties. In 1984, Leavitt executed a second confidentiality agreement, which added the obligation that he, for a year after leaving Picker, not compete to service any Picker CT Scanner he had worked on while employed by Picker.

As a Picker field service engineer, Leavitt was provided a great deal of Picker proprietary information and software, including DSO2, DSO3 and DSX3. Much of that information contained proprietary legends and copyright notices. In 1986, Leavitt was primarily employed by Picker to service a Synerview CT Scanner at the Leonard Morse Hospital in Massachusetts.

In November 1986, Leavitt contacted Imaging seeking employment. Quinn knew of Leavitt's agreements and obligations to Picker. Quinn, however, hired Leavitt, expecting he would bring with him valuable Picker proprietary information.

Leavitt terminated his employment with Picker. He refused, however, to return the Picker service documents and diagnostic software he was issued or to sign the standard Picker termination forms reaffirming his obligation to protect the confidentiality of its trade secret.

Leavitt provided Imaging with a great deal of Picker proprietary information, including DSX3, DSO3, and a notebook with many technical notes and test procedures, and schematic drawings. These materials were so voluminous and valuable that Imaging bought a copying machine to reproduce them. Imaging then removed the pages with copyright notices and proprietary legends, copied the documents, and provided them to

its employees for their use in competing with Picker.

In violation of his agreement not to compete, Leavitt's initial assignment for Imaging was to service the Synerview CT Scanner at the Leonard Morse Hospital that he had maintained as a Picker employee. In connection with this, Leavitt advised the Hospital not to return to Picker the manuals and other service documentation Picker regarded and had marked as proprietary.

Picker sued Leavitt and Imaging, in this court, for misappropriating its proprietary information and for conspiring to violate Leavitt's non-competition agreement. The parties agreed to a Partial Final Injunction, entered on February 13, 1989, pursuant to which Imaging agreed not to use 111 categories of documents and software obtained from Leavitt and certain other materials.[4] Leavitt was assigned by Imaging to work on Picker equipment at sites other than the Leonard Morse Hospital. Picker also sued the Leonard Morse Hospital and succeeded in obtaining the return of its manuals and other documentation. Prior to the trial of this case, Picker and Leavitt reached a settlement in which Leavitt agreed, among other things, that certain documents and software constituted the exclusive, confidential property of Picker and acknowledged that his failure to return them earlier had violated his employment and confidentiality agreements with Picker.

In response to competition from ISOs, including Imaging, Picker increased its efforts to protect its proprietary intellectual property. In about 1986, it revised its standard contract for sale to provide that: all operating software was merely licensed for customers use and remained the property of Picker; that the customer had no right to copy or transfer the software and related documents; and that the customer would take the necessary steps to protect the confidentiality of Picker's proprietary information. With regard to service software and documentation, the new standard terms provided that:

Any maintenance or service software and documentation shipped to or located at Customer's premises is intended solely to assist Picker employees in the installation, testing, service, and maintenance of the Equipment ... and Customer agrees to restrict access to such maintenance or service software and documentation to Picker employees only.

Standard Quotation Form, Revised 4/86, Trial Exhibit 16A.

By 1987, Picker had a policy that Picker proprietary documentation at customer sites should be kept in locked cabinets. This policy was not always followed in practice. The documents Picker regarded as proprietary, however, were clearly marked with proprietary legends and, in some instances, with copyright notices. In 1989, Picker issued a policy statement that the proprietary legend be placed on each page of proprietary documents, as well as on the cover. Few of the documents introduced as evidence in this case had the legend on each page.

Also in response to the emergence of ISOs, Picker by 1987 developed a set of non-proprietary service manuals which a customer could retain and use if it did not employ Picker to service its Synerview CT Scanner after the warranty period expired. These manuals contained only basic information and were not as useful as the much more sophisticated Picker proprietary manuals. The customer version of the manuals were copyrighted.

As of 1987, Picker had a policy of replacing its proprietary service manuals with more basic customer service documentation prior to the expiration of the warranty period or any additional service agreement. As in the case of Leonard Morse Hospital, however, Imaging often encouraged customers to refuse to let Picker remove its proprietary service manuals. These efforts succeeded at several institutions, including Monsour Hospital and Physicians Medical Imaging. In such instances, Imaging not only used Picker's materials to service the Synerview CT

---

4. As discussed in the Conclusions of Law, Imaging has acquired and evidently used copies of documents subject to the February 13, 1989 Partial Final Injunction. It is an open question whether this violation of the injunction was willful.

Scanner to which it directly applied, but copied them for use at other sites.

There were many sites which did not have an exclusive service agreement with Picker or an ISO. Rather, they would use Picker or a competitor at various times, depending on the nature of the service or repair required. Picker kept its proprietary materials at a number of such sites. Although such materials were in proprietary binders, Imaging used them whenever possible. Similarly, if Picker had installed DSO2 at such a site, Imaging used it and the related documentation which contained Picker proprietary legends.

In 1988, Picker brought a claim against Dr. William S. Witt of Nashville, Tennessee, seeking to recover the service and maintenance manuals it had shipped to Dr. Witt in 1985. The manuals contained the Picker proprietary legend. In February 1989, the United States District Court for the District of Tennessee held that the manuals were the property of Picker, rather than "system documentation" which had been sold to the customer. The court found that Picker's proprietary interest in the manuals was not extinguished by the fact that they had not been kept in locked cabinets. Accordingly, Dr. Witt was ordered to return Picker's service manuals. *See Witt v. Picker International, Inc.*, No. 3–88–0836 (M.D.Tenn., February 14, 1989).

The *Witt* case was much discussed among ISOs. Quinn was fully familiar with it. Indeed, he hired Dr. Witt's lawyer to represent him and Imaging in this case. Nevertheless, Quinn and Imaging continued to use documents bearing the Picker proprietary legend whenever possible.

Imaging's efforts to acquire the service manuals Picker placed in proprietary binders and copyrighted documents persisted to the eve of the trial. As described earlier, Quinn successfully encouraged Monsour Hospital not to permit Picker to remove its proprietary service manuals and other materials when Picker's work there ended. In July or August 1994, Imaging purchased those manuals and a set of the Picker copyrighted 1985 edition of Schematic Drawings from Scanner Corporation, which owned the Synerview CT

Scanner at Monsour Hospital. Scanner Corporation, however, did not own those manuals, which, as described earlier, Picker did not sell to customers. Indeed, under the 1985 version of the Data Rights provision contained in the Scanner Corporation contract of sale, Scanner Corporation acquired only the right to use the intellectual property residing in the CT Scanner, software and documentation it purchased, and undertook to protect it from others as Picker's confidential information. *See* July 11, 1985 Picker Quotation to Scanner Corporation, Trial Exhibit 223. Although the evidence does not demonstrate precisely what Scanner Corporation purported to sell to Imaging, it did not have the right to transfer any intellectual property it had acquired from Picker.

In conclusion, the evidence demonstrates that Imaging authored some technical notes, which it regularly stamped as confidential information of Imaging, but otherwise essentially built its business on documents and software developed at great expense by Picker for its own use. As the parties stipulated, the Picker service and repair documentation provides Picker with a competitive advantage. It is also of great value to any competitor of Picker which acquires it.

## IV. CONCLUSIONS OF LAW

The foregoing facts prove that Picker's business of servicing its Synerview CT Scanners is based on trade secrets which it has invested considerable time and money to develop, and which it has made reasonable efforts to protect. In contrast, Imaging's business of servicing Picker's CT Scanners is substantially based on a relentless campaign by Quinn to misappropriate and misuse Picker's trade secrets, and enduring efforts to cover-up that misconduct, including the fabrication of testimony by Quinn at trial. Imaging's misconduct in misappropriating and misusing Picker's trade secrets and other legally protected intellectual property includes, but is not limited to: violating its licensing agreement concerning DSO2; conspiring with Leavitt to violate his employment and confidentiality agreements with Picker in order to obtain Picker trade secrets; inducing Picker customers to violate

their obligations to restrict the dissemination and use of Picker's proprietary information; stealing Picker proprietary information from a Picker employee; illegally copying and distributing Picker's copyrighted materials; in some instances passing off Picker's protected materials as its own; and converting Picker's proprietary personal property for use in competing with Picker. More specifically, Picker has proven the following of its claims.

A. *Diagnostic Software and Related Documentation*

Picker has proven that DSO2 and successive generations of its diagnostic software, and the related documentation, are trade secrets; Picker reasonably sought to protect their confidentiality; and Quinn and Imaging misappropriated them.

■ On one level this issue is quite simple. In order to obtain the license to continue to use DSO2 and St. Francis Hospital—a right which was vital to Imaging's fledgling business—Imaging agreed that DSO2 was the "exclusive property" of Picker and would be treated as "confidential, proprietary information of Picker." Trial Exhibit 83, *supra*, at ¶ 1.2. Imaging has stipulated that this license expired in January 1986 and that it had no right under the license to use DSO2 after that date. *See* September 19, 1994 Stipulation. Imaging did, however, use DSO2 at many sites after January 1986. It now claims that it was entitled to do so because DSO2 was not a proprietary trade secret of Picker. The simple response to this claim is that Imaging is estopped from relying on it. *See In the Matter of Uniservices, Inc.*, 517 F.2d 492, 496–97 (7th Cir.1975) (chief executive officer who had authority to require employees to sign confidentiality agreements as to trade secrets was estopped, after termination of his employment, from denying that data were trade secrets as to him); *American Nursing Care of Toledo, Inc. v. Leisure*, 609 F.Supp. 419, 427–28 (N.D.Ohio 1984) (plaintiffs who discovered alleged fraud but continued to adhere to contract for two years after discovery were barred from attempting to renounce contract on basis of fraud). Having received valuable consideration from Picker for its agreement to respect DSO2 as

Picker's trade secret and not use it without Picker's authorization, it was improper—and indeed audacious—for Imaging to have employed DSO2 to build and perform its business when Picker reasonably refused to authorize that expanded use. Defendants are estopped from asserting that DSO2 and successive generations of diagnostic software are not trade secrets.

Nevertheless, in the interest of completeness, and because Imaging's conduct concerning DSO2 and successive generations of Picker's diagnostic software illuminates its state of mind concerning other Picker proprietary information, the court has also analyzed the merits of Imaging's claim that Picker's diagnostic software and the related documentation do not constitute protected trade secrets. This claim is incorrect.

■ Generally, one is liable for misappropriation of a trade secret if he or she uses improper means to acquire it, or knowingly exploits the improper acquisition or dissemination of a trade secret by a third-party. Restatement of Torts § 757; *Data General Corp.*, 36 F.3d at 1165. In essence, to establish its claim for misappropriation of a trade secret, a plaintiff must prove that: (1) the matter in question is a trade secret; (2) it took reasonable steps to preserve that matter's confidentiality; and (3) the defendant utilized improper means, or participated in his own or another's breach of a confidential relationship, to acquire and use the trade secret. *Id.*

■ DSO2 and successive generations of Picker software are classic trade secrets. They were developed by Picker as result of the investment of years of effort and great expense. As a practical matter, Picker's diagnostic software is vital to diagnosing quickly and precisely the problem with a Synerview CT Scanner. These qualities are very important to customers who want to minimize "downtime" and the cost of repairs. Thus, the diagnostic software is of great competitive value. The diagnostic software has been made available to Picker employees who have a need for it, subject to their written agreements to respect its confidentiality during their employment with Picker,

and to return it to Picker upon their departure. The only authorized disclosure of Picker's diagnostic software to individuals Picker did not employ was to some of its customers' in-house service engineers, who received copies with proprietary legends prohibiting unauthorized copying, disclosure and use, and subject to restrictions imposed by Picker's standard conditions of sale. Beginning in 1985, customer employees trained by Picker also executed individual confidentiality agreements. Thus, Picker's diagnostic software constitutes a trade secret. *See Data General v. Grumman*, 825 F.Supp. at 359 and 36 F.3d at 1165 (software is a trade secret); *ISC–Bunker Ramo Corp. v. Altech, Inc.*, 765 F.Supp. 1310, 1323 (N.D.Ill.1990) (computer program is a trade secret).

■ Picker at all times took reasonable security precautions to protect the trade secret that its diagnostic software represents. What is reasonable depends on the circumstances. *See Data General Corp.*, 825 F.Supp. at 359; *USM Corporation*, 379 Mass. at 101, 393 N.E.2d at 902. As the foreseeable threat to the confidentiality of DSO2 and its successors escalated, Picker's security measures grew. DSO2 was developed before Picker was faced with competition from any ISO. While DSO2 did not have a proprietary legend on the computer screen or a lockout mechanism, the software documentation which had to be consulted to run the various DSO2 tests described the information contained as proprietary and prohibited copying, disclosure or use without Picker's authorization. This was reasonable in the circumstances and sufficient to put Quinn and Imaging, among others, on notice that Picker regarded its diagnostic software as a trade secret, which they could not properly appropriate for their own, unauthorized use. *See Data General Corp.*, 825 F.Supp. at 359; *ISC–Bunker Ramo Corp.*, 765 F.Supp. at 1323.

By the time DSO3 was developed, the ISO industry had begun to emerge. Thus, Picker added proprietary legends to its computer screen and a mechanism intended to lockout unauthorized users. These security measures were reasonable in the circumstances. *Id.*

At no time did Picker publicly disclose the information essential to its diagnostic software by publishing papers, giving lectures, or providing proprietary information to the government in reports available to the public. Thus, this case is distinguishable in material respects from *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 852 (1st Cir.1985), which defendants incorrectly contend is analogous. More specifically, in *CVD*, there was sufficient evidence to conclude that no trade secrets existed because the material in question was regularly made available to the public. *Id.* Those facts stand in direct contrast to Picker's conduct in the instant case.

The means by which Quinn acquired DSO2 and its successors reinforces the conclusion that Picker's diagnostic software deserves protection as a trade secret. Quinn's claim that he was given DSO2 when trained by Picker is not credible. DSO2 was not available when Quinn was trained or when he was working with Picker to service the Synerview CT Scanner at St. Francis Hospital. While Picker has proven that Quinn did not initially receive DSO2 from Picker in an authorized manner, it remains uncertain how he first acquired it. As described earlier, however, when facing the risk of litigation because of the unauthorized use of DSO2 at St. Francis Hospital, Imaging and Quinn agreed not to use it elsewhere without Picker's permission in exchange for a limited license to employ the diagnostic software at St. Francis Hospital. Nevertheless, without Picker's permission, and often over its objection, Imaging copied and used DSO2 to build its business by servicing other sites. This represents the use of improper means, in breach of a confidential relationship, to acquire and use a trade secret which the Court of Appeals for the First Circuit recently confirmed is improper. *See Data General Corp.*, 36 F.3d at 1165.

Imaging also acquired DSO3 and the experimental version of it, DSX3, improperly. Initially, Imaging circumvented the lock-out mechanisms and ignored the Picker proprietary legends to access and copy the new diagnostic software at Monsour Hospital and at Physicians Medical Imaging. As discussed in § VI.F, *infra*, Imaging also ac-

quired DSO3 and DSX3 from Leavitt, knowing that to do so violated Leavitt's agreements with Picker. This too was improper. *See Data General Corp.*, 825 F.Supp. at 360; *ISC–Bunker Ramo Corp.*, 765 F.Supp. at 1334; *Anacomp, Inc. v. Shell Knob Services, Inc.*, 1994 WL 9681, at *12–13 (S.D.N.Y.1994).

 It is true that, as defendants contend, Picker did not obtain a copyright for its diagnostic software and related manuals. A copyright is not essential, however, to proof of a protected trade secret. *See Data General Corp.*, 36 F.3d at 1164 (trade secret claims are not preempted by federal Copyright Act); *ISC–Bunker Ramo Corp.*, 765 F.Supp. at 1323 (computer programs protected as trade secrets).

It is also true that Picker did not erect an "impenetrable fortress" to protect the trade secret its diagnostic software and related materials represented. It was not required to do so. *See USM Corp.*, 379 Mass. at 97, 393 N.E.2d at 900.

Picker's diagnostic software is entitled to protection in this case. It constitutes a trade secret. Picker made reasonable efforts to protect its confidentiality and prevent its misuse. Quinn and Imaging acquired Picker's diagnostic software through a pervasive pattern of misconduct, which continued in the form of Quinn's fabricated testimony at trial concerning his original acquisition of DSO2. As described earlier, "trade secret law is intended to maintain and promote standards of commercial ethics and fair dealing." *CVD, Inc.*, 769 F.2d at 842. Thus, "[t]he law puts its imprimatur on fair dealing, good faith and fundamental honesty. Courts condemn conduct which fails to reflect these minimum accepted moral values by penalizing such conduct whenever it occurs." *USM Corp.*, 379 Mass. at 104, 393 N.E.2d at 903. In view of the foregoing, Picker is entitled to prevail on its claim for protection of its diagnostic software and related documentation.

**B. *Copyrighted Materials***

 Picker has also proven that it is entitled to prevail on its claims concerning certain materials which constituted trade secrets and were also protected by valid copyrights. These materials include the 1984 edition of the Service Reference Handbook, the 1985 edition of Schematic Drawings, the 1983 edition of the X–Ray Control Manual, and the 1984 edition of the Installation Manual.[5]

Each of these items constitutes a Picker trade secret. More specifically, each of these items was developed by Picker as a result of the investment of great time and expense; each is of significant competitive value to Picker; none of the items can, as a practical matter, be replicated by Picker's competitors; and Picker used the whole panoply of reasonable security precautions described earlier to protect the confidentiality of these items. Thus, they constitute Picker trade secrets. *See USM Corporation*, 379 Mass. at 97, 393 N.E.2d at 900.

 Picker, however, also obtained additional protection for these items by acquiring valid copyrights for each of them. That copyright gave Picker the exclusive right to copy and distribute these materials. *See* 17 U.S.C. § 106; *ISC Bunker–Ramo Corp.*, 765 F.Supp. at 1323. Imaging and Quinn, however, obtained copies of these materials improperly, and violated Picker's copyright by reproducing and distributing them to Imaging's employees.

More specifically, with the exception of the one copy of the 1984 edition of the Service Reference Handbook discussed below, Picker never sold its copyrighted materials. Rather, it provided them only to its employees, for use on behalf of Picker, subject to their agreements to use them only on behalf of Picker and to return them to Picker upon the termination of their employment. In addition, Picker stored some of these materials at customer sites, but did not sell them to its customers. Thus, as discussed in more detail in §§ IV.C and F, *infra*, neither Picker former employees nor customers had the right

---

**5.** It appears that Imaging has also acquired and misused other Picker copyrighted trade secrets, including, but not necessarily limited to the High Speed Rotor Drive Manual, the High Speed Rotor Drive Parts List, and the 1985 Trackball Viewing Console Technical Manual.

to give Quinn and/or Imaging any of Picker's copyrighted trade secrets.

Nevertheless, Quinn and Imaging induced former Picker employees and customers to violate their obligations to Picker by to providing Imaging Picker's copyrighted materials. These distributions infringed Picker's copyright and rendered Imaging liable for contributory copyright infringement. *See ISC–Bunker Ramo Corp.*, 765 F.Supp. at 1331.

Quinn and Imaging then compounded their misconduct, committing numerous copyright violations by reproducing and distributing these materials to Imaging's employees in direct violation of 17 U.S.C. § 106. Quinn plainly recognized that the creation and distribution of these copies was illegal. That is why before distributing them he removed, or caused to be removed, the pages containing the copyright notices from the 1984 edition of the Service Reference Handbook and the 1985 edition of the Schematic Drawings, as well as the Picker proprietary legends on many other materials entitled to protection as trade secrets, but not copyrighted.

■ Accordingly, with one exception, Imaging and Quinn may not retain or use any Picker copyrighted materials. The one exception is that they may retain, use, or distribute a single copy of the 1984 edition of the Service Reference Handbook. As described earlier, this document was not supposed to be sold or distributed to anyone outside of Picker. It appears, however, that Imaging somehow managed to buy a copy from Picker's parts department. This represents a "first sale" of this document. *See* 17 U.S.C. § 109. Accordingly, Picker has lost its right to control the use and subsequent distribution of that particular copy of the 1984 edition of the Service Reference Handbook. *Id.; ISC–Bunker Ramo Corp.*, 765 F.Supp. at 1330. Imaging and Quinn, however, have no right to copy, or distribute copies of, that single volume.

C. *Picker Proprietary Service Manuals Stored at Customer Sites*

Picker has also demonstrated that the set of service manuals it stores at each customer site is a protected trade secret and that Imaging's use of those manuals has violated Picker's rights. *See Anacomp, Inc.*, 1994 WL 9681, at *2 (service manuals stored at customer sites to facilitate prompt service are trade secrets); *ISC–Bunker Ramo Corp.*, 765 F.Supp. at 1322–23 (general practice of non-distribution of service manuals supports trade secret status); *see also Technicon Data Systems Corp. v. Curtis 1000, Inc.*, 224 U.S.P.Q. 286, 290, 1984 WL 8268 (Del.Ch. 1984).

■ As described in the Findings of Facts, Picker prepares a set of service and repair manuals uniquely suited to serve as a reference for the maintenance and repair of the particular configuration of components comprising the CT Scanner to which it corresponds. These service manuals include some materials produced by component manufacturers which Imaging, among others, could purchase. The manuals also include information developed by Picker, with the investment of great time and expense, which is subject to proprietary legends and, in some instances, copyright notices. Because the average set of service and repair manuals comprises more than sixty volumes, they are not portable. Thus, Picker has stored a set of service manuals at the site of the CT Scanner to which it relates. Since 1986, the Picker standard purchase and sale agreement has included an acknowledgement that these manuals are Picker's property.

■ Manuals of this sort may be protected as trade secrets. *See ISC–Bunker Ramo Corp.*, 765 F.Supp. at 1321–22; *Anacomp*, 1994 WL, at *8. Generally, a compilation of information which is used in a business can be a trade secret. *Data General*, 825 F.Supp. at 359; *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736, 260 N.E.2d 723, 729 (1970); Restatement of Torts § 757, comment b. A compilation of public information is protected if that information is, as a result of a business' efforts, combined in a unique way. *ISC–Bunker Ramo*, 765 F.Supp. at 1321–22; *Anacomp*, 1994 WL 9681, at *8.

In the instant case, the service manuals at issue include a great deal of Picker proprietary information which is not made public, as

well as information Imaging could acquire from manufacturers of various components of the Synerview CT Scanner. The service manuals are compiled through the effort and expertise of Picker, for use by its employees only. As the manuals are assembled to relate to the special features of the CT Scanner to which they correspond, the information they contain is of significant value to Picker and its competitors. To the extent that the manuals include Picker confidential, copyrighted information, they cannot be properly duplicated by others. Thus, the manuals constitute protected trade secrets if Picker took reasonable measures to protect them. *USM Corporation*, 379 Mass. at 97, 393 N.E.2d at 900.

■ With regard to the service manuals, Imaging ardently argues that Picker has not taken the required reasonable security measures. More specifically, Imaging contends that Picker has forfeited their protection as trade secrets: by giving Quinn access to service manuals when he was authorized to participate in servicing the Synerview CT Scanner at St. Francis Hospital; by failing initially to place proprietary legends on every binder comprising the manuals; by not stamping each page as proprietary in the manner contemplated by Picker's policy; and by not always keeping the manuals locked-up at customer sites, as also provided by Picker policy. In addition, defendants claim that Picker sold these allegedly proprietary service manuals to its customers, who were free to resell them to Imaging. Each of these contentions is without merit.

In essence, the court finds that Picker initially took reasonable precautions to protect the trade secrets its service manuals represented and that those precautions escalated reasonably as the threat to their confidentiality from Imaging and, perhaps other ISO's, emerged. As discussed in § III.E, *infra*, when Quinn was given access to the service manuals he was reasonably regarded by Picker as an employee of C.A.T. Associates, subject to C.A.T. Associates' obligation to protect Picker's confidential information. At that time, although the manuals did not have Picker proprietary legends on the binders, many of the entries contained such leg-

ends, putting Quinn on notice that Picker regarded at least vital parts of the manuals as confidential and that he could not properly use the manuals without Picker's authorization.

As the ISO industry emerged, Picker began placing proprietary legends on each binder that was part of its service manual, and shipped its manuals to its service engineers, rather than to its customers. These later manuals contained even more proprietary legends and copyright notices. They were not, however, marked confidential on each page as one iteration of Picker's policy prescribed. This is not, however, fatal to the characterization of Picker's security precautions as reasonable. Rather, the measures Picker took were sufficient to place Quinn, Imaging, and others on notice that it deemed the manuals to be confidential and that it was not authorizing others to use them or to take them. *See USM Corp.*, 379 Mass. at 101, n. 12, 393 N.E.2d at 902, n. 12, ("[S]ecurity procedures need to be *optimized* rather than *maximized*").

The fact that Picker may not always have kept the manuals locked-up at customer sites does not qualify this conclusion. *Data General*, 825 F.Supp. at 359–60 (plaintiff took reasonable steps to preserve secrecy of information in diagnostic software program despite fact that few customers complied with obligation to return software upon termination of service agreement); *USM Corp.*, 379 Mass. at 97, 393 N.E.2d at 900. As the ISO's emerged, Picker did adopt a policy of having the manuals locked-up. The extent to which Picker employees followed this policy in practice is not clear. Quinn testified that manuals were left unlocked, but he did claim to have personal knowledge about many sites and, more importantly, the court doubts his credibility.

Even assuming, without finding, however, that the allegedly proprietary service manuals were at times not locked-up, in view of all the foregoing facts, denying protection to the Picker's service manuals would, once again, be inconsistent with the obligation of the court to "put its imprimatur on fair dealing, good faith, and fundamental honesty [and] condemn conduct which fails to reflect these

minimum accepted moral values by penalizing such conduct whenever it occurs." *USM Corp.*, 379 Mass. at 104, 393 N.E.2d at 903. As described in detail previously, Quinn and Imaging engaged in a pervasive and relentless campaign of misconduct to misappropriate Picker's trade secrets and violate its copyrights. That misconduct included encouraging Picker customers such as the Leonard Morse Hospital, Monsour Hospital, and Physicians Medical Imaging to refuse to let Picker replace its own copies of the service manuals with the customer versions that did not include Picker confidential information when Picker lost its service contracts with those customers. With regard to its service manuals, Picker clearly regarded them as proprietary and certainly tried, however imperfectly, to protect their confidentiality. The fact that Quinn and Imaging were able to access them as a result of inducing former Picker customers to violate their obligations to return the manuals to Picker, or because Picker employees did not always lock them up, does not mean they lost their status as Picker's trade secrets. *See* Restatement of Torts § 757 (it is improper to use a trade secret acquired from a third person with knowledge that the disclosure is a violation of his or her duty to another); *Data General Corp.*, 825 F.Supp. at 360.

However, even assuming, without finding, that Picker's conduct caused the service manuals to lose their status as trade secrets with regard to an honest competitor, the manuals are entitled to protection as confidential business information against the defendants, who engaged in pervasive misconduct to obtain and use them, without cost, to build and sustain Imaging's business. *See USM Corp.*, 379 Mass. at 104, 393 N.E.2d at 903.

■ As trial began, Picker also contended that Imaging's use of its service manuals stored at customer sites represented an illegal conversion of its personal property. This claim is correct. *See Evergreen Marine Corp.*, 4 F.3d at 95 (exercising dominion over and refusing to return property states a colorable claim for conversion); *Data General Corp.*, 795 F.Supp. at 505 (removal and use of

service and repair documentation states a colorable claim for conversion); *Baram v. Farugia*, 606 F.2d 42, 43 (3d Cir.1979) ("A person not in lawful possession of a chattel may commit conversion ... by intentionally using [it] ... without authority...."); *Restatement (Second) Torts* § 227 (1965) ("One who uses chattel in a manner which is a serious violation of the right of another to control its use is subject to liability to the other for conversion.").

■ As the foregoing suggests, the court finds to be without merit Imaging's claim that it has the right to use certain of Picker's proprietary service manuals because Imaging purportedly purchased them shortly before trial from the Scanner Corporation. Rather, if Imaging did acquire Picker's proprietary service manuals from the Scanner Corporation, Imaging's misconduct in the form of misappropriation of trade secrets, conversion, and contributory copyright infringement continued to the eve of trial.[6]

Scanner did not own the proprietary service manuals that Quinn claims Imaging purchased. As described earlier, Picker did not sell those manuals to its customers. Consistent with this, while the July 11, 1985 contract with Scanner Corporation indicates that Picker sold it "system documentation," there is no reference to any service manuals. Trial Exhibit 223, *supra.*

The post-contract correspondence between Picker and Scanner Corporation is consistent with this conclusion. Picker always asserted that it owned the service manuals, which were stored at Monsour Hospital solely for the convenience of its field service engineers. In analogous circumstances, it was held in the *Witt* case that the storing of Picker's service manual at the location of the CT Scanner to which it corresponded constituted a bailment rather than a transfer of ownership. *See Witt*, No. 3–88–0836, *supra.*

Moreover, even if Scanner Corporation had acquired some right in the service manuals, that right would have been subject to the restrictions imposed by its agreement with Picker. In 1985, the Scanner Corporation

---

**6.** Imaging did not introduce in evidence the service manuals purportedly purchased from Scanner Corporation. Nor did any witness from Scanner Corporation testify.

agreed to the then standard Data Rights and Transfer clauses in Picker's form contract. Trial Exhibit 223, *supra*, at ¶¶ 10 & 11. These provisions obligated the Scanner Corporation not to disclose Picker's intellectual property to third-parties and not to transfer the documents or information it received to anyone except any purchaser of its Synerview CT Scanner who had entered into a satisfactory agreement with Picker to protect its confidential information. These provisions plainly prohibited Scanner Corporation's purported sale of Picker's service manuals to Imaging.

 Some of the materials that Imaging claims to have purchased from Scanner Corporation bear copyright notices. As Picker did not sell those manuals to Scanner Corporation, Picker had the exclusive right to distribute them. 17 U.S.C. § 106(3). Thus, any sale by Scanner Corporation of copyrighted materials violated Picker's copyright, making Imaging liable for contributory copyright infringement. *See ISC–Bunker Ramo Corp.*, 765 F.Supp. at 1323–24.

In addition, the purported purchase of the Picker service manuals stored at Monsour Hospital is inconsistent with the February 13, 1989 Partial Final Injunction to which defendants agreed. On February 13, 1989, the court ordered that Imaging cease and desist from using any copies of specified documents. Those documents included Picker's Gantry Service Manual, High Speed Rotor Drive Service Manual, and High Speed Rotor Drive Parts List. Picker contends that these documents were included in its proprietary service manuals. If Quinn and Imaging acquired any or all of them from Scanner Corporation, and used them, they have acted inconsistently with the February 13, 1989 Partial Final Injunction. As noted earlier, it is an open question whether this conduct constituted a wilful violation of the Partial Final Injunction or a good faith mistake concerning its scope.

In any event, the court finds that the service manuals Picker characterizes as proprietary constitute its property and trade secret. This conclusion is not qualified by any sale by the Scanner Corporation to Imaging. Imaging and Quinn may not retain or use Picker's proprietary service manuals. As Picker acknowledges, however, it is not improper for defendants to have or use the customer versions of the service manuals, which do not contain Picker proprietary information.

D. *Technical Bulletins, Engineering Notes and Performance Tests*

 Picker's Technical Bulletins, Engineering Notes, and Performance Tests also constitute trade secrets improperly acquired and used by Imaging and Quinn.[7] As described in the Findings of Fact, Picker prepared these documents and tests for their service engineers who had executed confidentiality agreements, and authorized service engineers employed by certain customers, all of whom as of late 1983 also entered into individual confidentiality agreements with Picker. These documents and tests facilitate the diagnosis and repair of problems and, therefore, are of competitive value to Picker. These documents and tests contain proprietary legends putting potential users on notice that they are intended for the exclusive use of Picker employees, and that copying and distribution is prohibited. These items too are Picker trade secrets. *USM Corp.*, 379 Mass. at 98, 393 N.E.2d at 900. Once again, Picker employed its full range of security precautions to protect these trade secrets. These efforts were reasonable, but not successful.

 Quinn and Imaging acquired these Technical Bulletins, Engineering Notes, and Performance Tests in a variety of improper ways. In one instance Quinn stole a Picker confidential Technical Note from the briefcase of a Picker service engineer and had it surreptitiously copied. Many other items were obtained from Bruce Leavitt as part of Quinn's conspiracy with Leavitt to violate Leavitt's confidentiality agreements. As discussed in § IV.F, *infra*, Quinn and Imaging

---

7. The items in this category in Imaging's possession include, but may not be limited to: SSO3 Documentation Package; System Performance Test; and Service Engineering Technical Notes 1148, 1440, 1497, 1500, 1509, 1510, 1525.

received no legitimate right to use the documents and information thus acquired from Leavitt.

In these circumstances, Picker's Technical Bulletins, Engineering Notes, and Performance Tests constitute protected trade secrets.

### E. *The Documents Quinn Received in Training and from C.A.T. Associates and/or St. Francis Hospital*

 Contrary to defendants' contentions, none of the materials or software constituting trade secrets lost their otherwise protected status because Quinn received them in the course of his training by Picker or his work with the Synerview CT Scanner owned initially by C.A.T. Associates and later transferred to St. Francis Hospital. Rather, Quinn was held out by C.A.T. Associates to be, and was reasonably regarded by Picker to be, a representative of C.A.T. Associates, which was under an obligation not to transfer any materials or information it received from Picker without Picker's permission. Quinn knew that he was receiving information that Picker deemed confidential and that C.A.T. Associates had agreed to protect as such. He knew, or certainly should have known, that as a representative of C.A.T. Associates he shared this obligation. Nevertheless, he misappropriated materials and information furnished to C.A.T. Associates in order to establish Imaging and compete with Picker. This misconduct does not operate to erode the protection the law provides to Picker's trade secrets. *See Data General Corp.*, 825 F.Supp. at 360; *Curtiss–Wright Corp. v. Edel–Brown Tool & Die, Co.*, 381 Mass. 1, 4–5, 407 N.E.2d 319, 323–24 (1980); Restatement of Torts, § 757.

More specifically, as set forth in the Findings of Facts, Picker sold to C.A.T. Associates, subject to restrictions, the intellectual property necessary to operate the Synerview CT Scanner it had purchased. Picker did not license or sell to C.A.T. Associates the documents and software necessary to maintain and repair that CT Scanner which is at the heart of this case. In any event, as stated in the Data Rights provision of its contract, C.A.T. Associates acknowledged that the intellectual property to which it received access was confidential to Picker, and agreed to protect it as such. This license did not destroy Picker's right to the protection of its trade secrets. *See ISC–Bunker Ramo Corp.*, 765 F.Supp. at 1334; ("ISC's partial disclosures to third parties who are under obligations of confidentiality do not alter the trade secret status of ISC's computer programs, compilations, technical information and procedures."); *Data General Corp. v. Digital Computer Controls, Inc.*, 297 A.2d 433, 435–36 (Del.Ch.1971).

In the contract of sale, the parties also agreed that if C.A.T. Associates resold its CT Scanner, Picker would permit the transfer of its confidential information to the resale customer if it first agreed to protect the confidentiality of that information, and paid a reasonable fee for it. Quinn was fully familiar with these provisions, which he had helped negotiate. C.A.T. Associates had held him out to Picker as its employee, although he was actually on the payroll of the St. Francis Hospital, to which C.A.T. Associates intended to transfer its CT Scanner. In the circumstances, Picker reasonably relied on the restrictions applicable to C.A.T. Associates in permitting Quinn to participate in the installation and initial servicing of the Synerview CT Scanner and St. Francis Hospital, and in providing him the training for which C.A.T. Associates contracted and paid.

It would have been improper for C.A.T. Associates to have misrepresented Quinn's status to provide him unrestricted access to Picker's trade secrets. *See Continental Data Systems, Inc. v. Exxon Corp.*, 638 F.Supp. 432, 435–43 (E.D.Pa.1986) (trade secret violation where competitor misrepresented itself as a customer to gain confidential information). This did not, however, occur. Rather, C.A.T. Associates and Picker both regarded Quinn as an employee of C.A.T. Associates when he was given access to Picker confidential information and trade secrets while working with Picker at St. Francis Hospital, and being trained by Picker in Ohio. Thus, Picker reasonably expected that Quinn would use its confidential information only with regard to the Synerview CT Scanner at St. Francis Hospital.

The manner of Quinn's training does not qualify this conclusion. Quinn was not present for the first phase of the training when the confidentiality of the information and materials being furnished was described. Nor was he required to sign personally the confidentiality agreement executed by later generations of trainees. Nevertheless, Quinn encountered many reminders that he was being given access to information Picker regarded as confidential and expected him to respect as such. His training occurred in a secure building, which permitted access only to specifically identified, authorized Picker employees and guests. The training materials were kept in a caged area, which was usually guarded by an attendant, and which Quinn accessed to get extra materials when the attendant was absent. In addition, many of the materials Quinn received in training, particularly those relating to Picker' software, were marked as Picker proprietary information, with legends stating that they could not be used, copied, or disclosed without the express written permission of Picker.

In these circumstances, Picker communicated in a fashion which should have been clear to Quinn that he was being given materials and information: (1) as a representative of C.A.T. Associates, not individually; (2) subject to the restrictions concerning confidential information to which C.A.T. Associates had agreed; and (3) for use concerning the CT Scanner at St. Francis Hospital only. Thus, in working with and training Quinn, Picker took reasonable precautions to protect its trade secrets.

Moreover, C.A.T. Associates had no right to transfer the materials Picker provided to Quinn as C.A.T. Associates' representative to Quinn individually or to Imaging. C.A.T. Associates' agreement with Picker permitted the transfer of Picker's confidential information furnished to C.A.T. Associates only to its resale customer, and then only if that customer entered into a satisfactory confidentiality agreement with Picker. Neither Quinn nor Imaging ever purchased the Synerview CT Scanner sold to C.A.T. Associates and later transferred to St. Francis Hospital. Nor did C.A.T. Associates, Quinn or Imaging ever notify Picker that Quinn had taken the intellectual property Picker had provided to C.A.T. Associates. In view of the foregoing, Picker's trade secrets and confidential information did not lose their protected status as a result of being disclosed to Quinn as a representative of C.A.T. Associates.

### F. Documents and Software Received from Bruce Leavitt

██ Imaging and Quinn are not entitled to possess or use any Picker documents or software acquired from Bruce Leavitt. Indeed, pursuant to the February 13, 1989 Partial Final Injunction Imaging should not have any such items because it agreed to destroy or return them to Picker, and not to use any copy of them.

As described in the Findings of Fact, Leavitt had signed confidentiality agreements with Picker, undertaking to use Picker's trade secrets only on behalf of Picker and not to disclose them to anyone else. Leavitt also agreed to return to Picker its documents and diagnostic software upon termination of his employment. Quinn knew of these agreements, but hired Leavitt in part to acquire the bonanza of Picker proprietary information Leavitt planned to bring with him.

Leavitt did violate his agreements with Picker and furnished to Imaging at least 111 categories of Picker proprietary Technical Notes, Engineering Bulletins, manuals, and diagnostic software. *See* Ex. A. to February 13, 1989 Partial Final Injunction. Quinn bought a copying machine so Imaging could efficiently reproduce these materials.

██ Picker's proprietary materials did not lose their protected status as a result of Leavitt's unauthorized disclosures to Quinn and Imaging. As indicated earlier, it is axiomatic that:

> One who ... uses another's trade secret, without a privilege to do so, is liable to the other if ... (c) he learned the secret from a third person with notice ... that the third person's disclosure of it was otherwise a breach of his duty to the other.

Restatement of Torts § 757. This principle has regularly been applied to provide protection to information disclosed to competitors

by individuals violating confidentiality agreements with their former employers. *See Data General Corp.,* 825 F.Supp. at 360; *ISC–Bunker Ramo Corp.,* 765 F.Supp. at 1334–35; *Anacomp, Inc.,* 1994 WL 9681 *12–13. This principle applies equally to Leavitt's unauthorized disclosures to Quinn and Imaging.

## V. *RELIEF*

█ Picker has prevailed in this litigation. As the remedy for the violations of its right by Quinn and Imaging, Picker requests relief in the form of an order: (1) requiring the return or destruction of all documents and software constituting its misappropriated trade secrets, copyrighted materials, and software; (2) permanently enjoining defendants from violating Picker's copyrights; (3) permanently enjoining defendants from misappropriating Picker's trade secrets; and (4) appointing a monitor to facilitate and ensure compliance with the order. For the reasons set forth below, Picker is entitled to all of the relief it requests.

As described previously, Quinn and Imaging have since 1984 engaged in a persistent and pervasive effort to misappropriate Picker's trade secrets, violate Picker's copyrights, and use Picker's personal property for the benefit of Imaging. Indeed, Imaging's business was founded, and has been built, on such misconduct. Imaging and Quinn have also consistently attempted to cover-up their misconduct. Their effort endured through trial, at which the court has found that Quinn fabricated at least his testimony concerning his acquisition of DSO2.

█ Accordingly, the court finds that Picker has proven that there is an enduring threat that Quinn and Imaging will abuse Picker's legally protected intellectual property if an injunction is not issued. Moreover, there is plainly no adequate remedy at law for past or future misconduct by Quinn and Imaging. The misuse of trade secrets is generally deemed to involve irreparable harm. *See e.g., ISC–Bunker Ramo Corp.,* 765 F.Supp. at 1334–35; *Technicon Data Systems,* 224 U.S.P.Q. at 292–93. This conclusion is particularly compelling in this case. Imaging has filed for bankruptcy and Picker was required to waive its claims for damages in order to obtain the limited relief from the resulting automatic stay which permitted Picker to try its claims for injunctive relief in this case. Accordingly, an injunction will issue.

In addition, because defendants' misconduct persisted through trial, and because Imaging may have wilfully violated the February 13, 1989 Partial Final Injunction by acquiring from Scanner Corporation, and presumably using, certain materials subject to that restraint, the court finds that there is an extraordinary risk that the Order now being issued will be disobeyed if its implementation is not monitored. Thus, a monitor will be appointed to supervise compliance with the injunction, and to bring any issues or problems concerning compliance to the attention of the court.

The injunction being issued will not prevent Quinn and Imaging from servicing Picker CT Scanners using materials they themselves have legitimately developed or purchased from manufacturers of components. Nor shall it operate to keep defendants from using materials Picker has placed in the public domain, such as the nonproprietary version of its service manuals it sells to customers. The order is, however, intended to ensure the cessation of defendants' practice of profiting from the misappropriation of Picker's trade secrets, copyrighted material, and personal property.

The specific reasons for each element of the remedy being ordered are as follows.

### A. *Requiring the Return or Destruction of Picker's Trade Secrets, Copyrighted Materials and Personal Property*

"[T]hat equity will protect against the unwarranted disclosure or use of a trade secret is 'settled beyond peradventure.'" 3 *Milgrim on Trade Secrets,* § 15.02[1][a], 15–134–35 (1994), (quoting *Empire Steam Laundry Co. v. Lozier,* 165 Cal. 95, 130 P. 1180, 1182 (1913)). Consistent with this, Massachusetts has by statute authorized the issuance of injunctions to protect trade secrets. *See* M.G.L. c. 93, § 42A.

Where, as here, it has been proven that the defendant has misappropriated trade secrets and continues to possess them, it is common for courts to order their return or destruction. *See* 3 *Milgrim on Trade Secrets,* § 15.02[4][a], 15–266; *Remington Rand Corporation–Delaware v. Business Systems Inc.,* 830 F.2d 1260, 1269 (3rd Cir. 1987); *Picker International, Inc. v. Blanton,* 756 F.Supp. 971, 983 (N.D.Tex.1990); *Institutional Management Corp. v. Translation Systems,* 456 F.Supp. 661, 671 (D.Md.1978); *Curtiss–Wright Corp.,* 381 Mass. at 9, 407 N.E.2d at 325. Such an order is necessary and appropriate in this case with regard to Picker's trade secrets, copyrighted materials, and personal property.

### B. *Prohibiting Future Copyright Infringement*

 The federal Copyright Act authorizes the court to "grant a ... final injunction on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). "As a general rule, a permanent injunction will be granted when liability has been established and there is a threat of continuing violations." *MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 520 (9th Cir.1993); *see National Football League v. McBee & Bruno's, Inc.,* 792 F.2d 726, 732 (8th Cir.1986); *3 Nimmer on Copyright,* § 14.06[B] at 14–88. This is such a case.

 Moreover, when, as here, there has been a history of copyright infringement which persuades the court that there is a threat of future violations, an injunction may properly be entered which applies "not only to the works as to which infringement has already been adjudicated, but also to any other works presently owned by plaintiff." 3 *Nimmer on Copyright* § 14.06[B] at 14–100 (1994); *see also Walt Disney Co. v. Powell,* 897 F.2d 565, 568 (D.C.Cir.1990); *Basic Books, Inc. v. Kinko's Graphics Corp.,* 758 F.Supp. 1522, 1542 (S.D.N.Y.1991). Picker has proven that such an injunction is necessary and appropriate in this case.

### C. *Prohibiting Misappropriation of Picker's Trade Secrets and Personal Property in the Future.*

 It is also necessary and appropriate to issue an injunction restraining Quinn and Imaging from misappropriating and misusing Picker's trade secrets and personal property, as well as copyrighted materials, in the future. The court recognizes that "injunctions must be reasonable as to time." *Curtiss–Wright Corp.,* 381 Mass. at 10, 407 N.E.2d at 326. However, an "injunction is not unreasonable merely because it is permanent" or indefinite in duration. *Id.* (citations omitted). Rather, what is reasonable depends on the facts of the particular case. *Id.*

In view of the more than 10–year campaign of misconduct by Quinn and Imaging to acquire Picker's legally protected intellectual property, which continued through trial, the court is persuaded that without an indefinite injunction the past will be prologue, and defendants' future activities will generate renewed litigation between the parties. In these circumstances, Picker is entitled to the an order indefinitely enjoining Imaging and Quinn from misappropriating or misusing its trade secrets. *See Curtiss–Wright Corp.,* 381 Mass. at 10–11, 407 N.E.2d at 326; *Peggy Lawton Kitchens, Inc. v. Hogan,* 18 Mass. App.Ct. 937, 940, 466 N.E.2d 138, 140–41 (1984); *MAI Systems Corp.,* 991 F.2d at 524.

### D. *The Monitor*

The court also concludes that it is essential to the fair, effective, and efficient implementation of its Order that a Monitor be appointed to supervise, facilitate, and report on the implementation of the Order. Thus, the court is appointing as Monitor James A. Ring, a former Special Agent of the Federal Bureau of Investigation, who is now Director of Investigative Services at the law firm of Choate, Hall & Stewart.

This appointment is being made pursuant to the court's inherent power to appoint a person to assist it in administering a remedy rather than under Fed.R.Civ.P. 53. *See Ruiz v. Estelle,* 679 F.2d 1115, 1161 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983) ("[R]ule 53 does not terminate or modify the district

court's inherent equitable power to appoint a person, whatever be his title, to assist it in administering a remedy"); *Schwimmer v. United States,* 232 F.2d 855, 865 (8th Cir.), *cert. denied,* 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956) ("Beyond the provisions of [Fed.R.Civ.P. 53] for appointing and making references to Masters, a Federal District Court has 'the inherent power to supply itself with this instrument for the administration of justice when deemed by it essential.'" (quoting *In re Peterson,* 253 U.S. 300, 311, 40 S.Ct. 543, 547, 64 L.Ed. 919 (1920)); *Jenkins v. Missouri,* 890 F.2d 65, 67 (8th Cir.1989); *Constant v. Advanced Micro–Devices,* 848 F.2d 1560, 1566 (Fed.Cir.), *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988); *Veneri v. Draper,* 22 F.2d 33, 35 (4th Cir.1927), *cert. denied,* 276 U.S. 633, 48 S.Ct. 339, 72 L.Ed. 742 (1928).

The Monitor shall seek to assure that Quinn, Imaging, and those acting in concert with them, comply with the Order; work with the parties in an effort to resolve any questions or disputes concerning whether particular documents or software are subject to the Order; advise the court of the existence of any enduring disputes so that the court can establish a procedure for resolving them; and report to the court regarding the status of compliance with the Order and whether it should be perpetuated. The court does not now expect the Monitor will be asked to express an opinion concerning whether any document or software in dispute is legally protected and subject to the Order. If such disputes emerge, the court may give the Monitor this power or appoint someone with appropriate expertise to serve as a Master, pursuant to Fed.R.Civ.P. 53, or as an expert pursuant to Fed.R.Evid. 706. *See Syntex Ophthalmics v. Tsuetaki,* 701 F.2d 677, 684 (7th Cir.1983) (To resolve disputes concerning whether information was a trade secret subject to injunction, court permissibly appointed patent lawyer as its own expert); *American Can Company v. Mansukhani,* 742 F.2d 314, 333, n. 23 (7th Cir.1984). (suggesting appointment of a special master to distinguish between public information and plaintiff's trade secrets subject to injunction).

There are several factors which persuade the court that a Monitor should be appointed. In view of the long history of extensive misconduct by the defendants, the court is skeptical whether Quinn and Imaging will, in the absence of oversight, obey the court's Order to return or destroy all of Picker's protected documents and software, and not misappropriate Picker's protected intellectual property in the future.

This skepticism is heightened by the question of whether Imaging has wilfully violated the February 13, 1989 Partial Final Injunction by acquiring from Scanner Corporation, and presumably using, copies of documents subject to that injunction. The appointment of special masters in such circumstances has commonly been found to be justified. *See* 5A *Moore's Federal Practice,* ¶ 53.05[2], 53–63 ("Masters are particularly useful in cases where noncompliance is alleged."); *National Organization for the Reform of Marijuana Laws v. Mullen,* 828 F.2d 536, 542 (9th Cir. 1987); *Gary W. v. Louisiana,* 601 F.2d 240, 244 (5th Cir.1979). In the instant case, Imaging claims that it did not wilfully violate the Partial Final Injunction, which it interpreted to apply only to copies of documents it received from Leavitt. While the court has not decided this issue, the appointment of the Monitor is important to minimizing the risk that questions of civil and/or criminal contempt will arise with regard to the Order now being issued.

As the foregoing implies, the court does not consider it to be efficacious or appropriate to rely on plaintiff and its counsel to assume the traditional role of assisting in the implementation of its Order. There is manifest antipathy and distrust between the opposing parties and counsel, most recently and vividly displayed in plaintiff's pending motion for sanctions. In the circumstances, the Monitor should serve as a much-needed buffer between the parties.

In addition, the Monitor should help ensure that the Order does not have an unwarranted, chilling effect on the conduct of Imaging's business—if Imaging is able to conduct its business legitimately. The Order addresses certain trade secrets and other protected Picker intellectual property

now subject to it. Those protected items in defendants' possession must be returned or destroyed. The Order, however, also operates prospectively. Thus, it is possible that defendants will in the future wish to acquire and use items they believe Picker has placed in the public domain. It is preferable that defendants not be faced with the choice of risking contempt proceedings or failing to use items created by Picker which are not legally protected. *See American Can Corp.*, 742 F.2d at 333 n. 23. Thus, after the initial destruction or return of Picker proprietary materials now in defendants' possession, they will be required to inform the Monitor if they wish to possess and/or use any document or software created by Picker which is not specifically addressed in the Order now being issued, or which they contend has lost its now protected status. The Monitor shall consult Picker and either inform defendants that it is agreed that the proposed use would not violate the Order, or attempt to mediate any disputes. The Monitor shall inform the court of any enduring disputes which the court must resolve.

In essence, the Monitor shall supervise the implementation of the Order and report to the court concerning compliance. Although an indefinite injunction is being issued, the court is directing that the Monitor report periodically concerning the status of compliance and report by July 1, 1997, as well as annually thereafter, concerning his view as to whether the continuation of the injunction is necessary.

As the Monitor is necessitated by defendants' conduct, the defendants will be responsible for the costs of his services, which will be minimized if defendants faithfully comply with the Order. *See Gary W.*, 601 F.2d at 245–46. To assure the Monitor is compensated, however, plaintiff shall, as it suggested, pay any invoice which has been approved by the court and unpaid for 21 days. Imaging and Quinn shall be obligated to reimburse Picker promptly for any such payment(s).[8]

## VI. *ORDER*

At the June 5, 1995 hearing the court informed the parties that it had decided the case in favor of Picker and would issue an appropriate injunction as part of this Memorandum and Order. Accordingly, the court then ordered Imaging, Quinn, their agents and employees, not to transfer, copy or secrete any Picker documents, software, and other information Picker alleged to be proprietary or otherwise protected. *See* June 5, 1995 Order.

As indicated on June 5, 1995, and for the reasons described in detail in this Memorandum, it is hereby further ORDERED that:

1. Defendants Imaging Equipment Services, Inc. ("Imaging"), Thomas J. Quinn, their officers, agents, servants, employees and attorneys, and all other persons acting in concert with either or both of them who receive actual notice of this Order, are restrained and enjoined from possessing, using, copying, distributing, or receiving from anyone except an authorized representative of Picker International, Inc. ("Picker"), the following documents and software, and any copies thereof:

(a) Any diagnostic software created by Picker for its CT Scanners, and related documentation, including but not limited to DSO2, DSX3, DSO3, and their respective User's Guides.

(b) Any document or software bearing a Picker copyright notice, including but not limited to the: X–Ray Control Manual; June 10, 1985 Schematic Drawings for the Synerview CT Scanner; 1984 edition of the Service Reference Handbook for the Synerview CT Scanner; the 1984 Edition of the Synerview CT Scanner Installation Manual; the High Speed Rotor Drive Parts Manual; the High Speed Rotor Drive Parts List; and the 1985 Trackball Viewing Console Technical Manual.

(c) Any Engineering Note, Technical Bulletin, or Systems Performance Test

---

8. As the parties paid limited attention to the possible appointment of a Monitor in their submissions, the court will reconsider the terms of that appointment, for good cause shown. If defendants wish to address this issue further, they shall do so by July 17, 1995, and Picker shall respond by July 31, 1995.

which is distributed by Picker to its field service engineers.

(d) Any Picker Service Manual which contains a Picker proprietary legend on the cover or on any document contained therein.

(e) Any document or software relating to Picker CT Scanners acquired by defendants or those acting in concert with them from the Scanner Corporation.

(f) Any document or software provided by Picker to C.A.T. Associates, or to Quinn in connection with his association with C.A.T. Associates, including but not limited to the documents and software obtained in connection with Picker's training of Quinn, such as, without limitation, the 1983 Edition of the X–Ray Control Manual; the 1983 edition of the Schematic Drawings; the SS1200 (operating) Software Manual; the CRT Perkin Elmer User's Guide; the High Speed Starter's Guide; and the binders, manuals, and other materials comprising Trial Exhibits 320 and 327.

(g) Any document or software received from Bruce Leavitt, including but not limited to those identified in Exhibits A and B to the February 13, 1989 Partial Final Injunction.

(h) Any document, compilation of documents, manual, or software relating to the service of CT Scanners manufactured by Picker and bearing any label or legend stating that such item contains Picker proprietary information.

2. Notwithstanding paragraph 1 hereinabove, defendants Imaging and Quinn, and those they employ, may:

(a) Until August 18, 1995, and not thereafter, use existing copies of documents and software included in Paragraph 1 hereinabove for the sole purpose of servicing Picker CT Scanners that Imaging was before July 1, 1995 obligated to service.

(b) Possess, use and/or distribute, but not reproduce, one copy of the 1984 edition of the Picker Service Reference Handbook.

3. All documents and software subject to paragraph 1 hereinabove shall by October 1, 1995, be either destroyed or returned to Picker pursuant to the plan to be developed by the Monitor appointed pursuant to paragraph 5 of this Order. That plan shall be reviewed, modified if necessary, and approved by the court. The return or destruction of the documents and software subject to this Order shall be conducted under the supervision of the Monitor.

4. If, after the return or destruction of the documents and software now in defendants' possession, custody or control which are subject to this Order, Imaging, Quinn, or those acting in concert with them wish to possess or use any document or software bearing a Picker proprietary legend which Imaging or Quinn assert has never been legally protected, or has lost its protected status as a result of Picker's conduct placing it in the public domain, they shall so inform the Monitor, who shall consult Picker, attempt to mediate any disagreements, and inform the court of any intractable disputes. If there are enduring disputes, defendants may move for a declaratory judgment and modification of this Order concerning any disputed item(s).

5. James A. Ring shall serve as a Monitor to supervise and assure compliance with this Order. Mr. Ring's powers and responsibilities, which may be modified by the court from time to time, shall include the following:

(a) Performing the functions described in paragraphs 3 and 4 hereinabove.

(b) To the extent he deems necessary and appropriate, conferring or otherwise communicating with the parties and their representatives, inspecting Imaging's premises and sites at which Imaging services Picker CT Scanners, and requiring statements or testimony under oath from defendants and those acting in concert with them.

(c) Reporting to the court by October 20, 1995 concerning the status of compliance with this Order.

(d) Monitoring defendants' compliance with this Order after the return and destruction of the documents and software now subject to it, and reporting on the status of compliance every six months.

(e) Reporting by July 1, 1997, and annually thereafter if necessary, concerning

whether this Order should be perpetuated or whether, because of changed circumstances, it should be terminated.

(f) Providing to the parties copies of his reports to the court.

6. The Monitor shall be compensated for the time he reasonably devotes to this matter at his usual hourly rate and shall be reimbursed for his reasonable expenses. The Monitor shall submit his bills monthly to the court for approval. Defendants shall pay the Monitor the amount(s) approved by the court within 21 days of approval. If such payment is not made by defendants when due, the Monitor shall submit his approved charges to Picker, which shall pay them within 21 days. Defendants shall reimburse Picker promptly for any amount(s) so advanced.

7. A hearing will be held on August 14, 1995 at 3:00 p.m. to introduce the Monitor to the parties and to address any issues concerning the implementation of this Order.

8. The court retains jurisdiction of this case for the purpose of enforcing this Order.

9. Any possible violation of this Order may be addressed as a matter of civil and/or criminal contempt.