**HARBOR SOFTWARE, INC., Plaintiff,**

v.

**APPLIED SYSTEMS, INC., Defendant.**

**No. 92 Civ. 8097 (HB).**

United States District Court, S.D. New York.

June 5, 1995.

Jeffrey C. Slade, Leventhal Slade & Krantz, New York City, for plaintiff.

Jeffrey D. Ullman, Ullman, Furhman, Platt & Koy, Morristown, NJ, for defendant.

## OPINION AND ORDER

BAER, District Judge:[1]

Plaintiff Harbor Software has asserted six causes of action against defendant Applied Systems, all of which involve the alleged

---

1. Carole Gottesman, a second-year student at New York Law School, assisted in the research and preparation of this opinion.

copying or misappropriation of part, or all, of Harbor's computer software package "Sales Center Manager" ("SCM"). Defendant produced and put on the market a computer software package called "The Agency Manager" ("TAM") which, plaintiff alleges, contains all, or substantial parts, of SCM. Both software programs appear to perform the same functions, which enable insurance companies to automate their marketing activities. Plaintiff alleges copyright infringement, trade secret misappropriation, unfair competition, unjust enrichment, fraud, and Lanham Act violations.

Defendant Applied Systems has moved for summary judgment on all causes of action except copyright infringement, relying primarily on its assertion that the facts adduced thus far indicate that plaintiff cannot sustain various elements of the subject claims. Def.'s Mem.L.Supp.Mot.Summ.J. at 1. In addition, defendant asserts that the Copyright Act, 17 U.S.C. § 301, preempts the trade secret misappropriation and unfair competition claims. *Id.*

The Court heard oral argument on this motion on January 31, 1995. For the reasons set forth herein, defendant's motion for summary judgment is DENIED in its entirety.

## I. BACKGROUND

Plaintiff Harbor Software is a Michigan corporation whose principal product, SCM, was created chiefly by its president Jeffrey Tollaksen. Defendant's representatives saw Tollaksen demonstrate SCM at two insurance industry conventions in late 1988, and asked Tollaksen about the possibility of integrating defendant's program, TAM, with SCM. Tollaksen visited defendant's headquarters in May 1989 to further demonstrate SCM. Before demonstrating the software, Tollaksen requested that Thomas Eustace, who was then managing Applied Systems, sign a confidentiality agreement. Eustace refused to sign the agreement, but, according to plaintiff, assured him that "the confidentiality agreement would be part of whatever business agreement was eventually worked out." Pl.'s Mem.L.Opp'n Mot.Summ.J. at 6.

Shortly thereafter, plaintiff and defendant entered into an agreement whereby Tollaksen worked at defendant's headquarters to explore the possibility of integrating SCM with TAM. Defendant was then considering either integrating SCM with TAM, or marketing SCM as a stand-alone product. Def.'s Mem.L.Supp.Mot.Summ.J. at 7. Defendant agreed to pay Tollaksen $2,000 per month for 40 hours of work each month, plus $50 per hour for every additional hour spent working on the integration. Defendant paid Tollaksen $8,500 between February 1989 and May 1989 pursuant to this agreement. *Id.* at 9. While working on this project, Tollaksen loaded portions of the SCM source code onto defendant's computers. Pl.'s Mem.L.Opp'n Mot.Summ.J. at 9. Defendant disputes the period of time during which SCM was loaded onto its computers and denies that its employees could, as a result, access the source code without Tollaksen's knowledge. Def.'s Mem.L.Supp.Mot.Summ.J. at 9.

Plaintiff asserts that Tollaksen had completed the integration of SCM and TAM by the end of his stay there in May 1989, Pl.'s Mem.L.Opp'n Mot.Summ.J. at 9; defendant, meanwhile, challenges this characterization of the work's state, Def.'s Mem.L.Supp.Mot. Summ.J. at 11. Defendant then ceased negotiations with plaintiff on possibly acquiring licensing rights for SCM. According to plaintiff, this was effected by a phone call from Eustace, who stated, "The business deal is not going to go through." When Tollaksen asked why, Eustace explained that a certain search performed by SCM had been completed "too slow[ly]." When Tollaksen stated that this could be corrected, Eustace allegedly responded that it did not matter. Pl.'s Mem.L.Opp'n Mot.Summ.J. at 10. In the spring of 1990, plaintiff discovered that defendant had released a new version of TAM. Plaintiff relates that the similarities of that software program to SCM prompted this litigation.

## II. THE COPYRIGHT ACT: PREEMPTION OF STATE LAW CLAIMS?

█ Defendant argues in support of its motion for summary judgment that certain of

plaintiff's causes of action are preempted by the federal Copyright Act. Section 301(a) of the Copyright Act expressly preempts actions that would be tantamount to state law copyright claims. However, Section 301(b) of the Act specifically permits state law claims "that are not equivalent to any of the exclusive rights within the general scope of copyright" of the Act. Whether or not a state claim is preempted by the Copyright Act depends on whether there is some "extra element" involved in the state law cause of action that "changes the nature of the action so that it is qualitatively different from a copyright infringement claim." *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F.Supp. 1523, 1535 (S.D.N.Y.1985); *see also Computer Assocs. Int'l, v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir.1992); *Harper & Row Publishers v. Nation Enters.*, 723 F.2d 195, 200–01 (2d Cir.1983), *rev'd on other grounds*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

■ State law causes of action that have been held not to be preempted by the Copyright Act include breach of confidentiality, breach of trust, unfair competition, and trade secret misappropriation. *Computer Assocs. Int'l*, 982 F.2d at 717 (stating that many state law causes of action are not preempted (citing *Balboa Ins. Co. v. Trans Global Equities*, 218 Cal.App.3d 1327, 267 Cal.Rptr. 787, *cert. denied*, 498 U.S. 940, 111 S.Ct. 347, 112 L.Ed.2d 311 (1990))); *see also Mayer*, 601 F.Supp. at 1536 (1985) (breach of confidentiality and unjust enrichment); *DC Comics, Inc. v. Filmation Assocs.*, 486 F.Supp. 1273 (S.D.N.Y.1980) (unfair competition). Accordingly, I reject defendant's assertion that plaintiff's trade secret misappropriation and unfair competition claims are preempted.

### III. *SUMMARY JUDGMENT STANDARD*

■ Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment where the evidence shows that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Summary judgment is properly regarded

... as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987). An issue of credibility is insufficient to preclude the granting of a motion for summary judgment. Neither side can rely on conclusory allegations; instead, the disputed issues of fact must be supported by evidence that would allow a "rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Finally, factual disputes that are irrelevant to the disposition of the suit under governing law will not preclude entry of a summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

### IV. *ILLINOIS TRADE SECRETS ACT*

■ Both parties agree that the law to be applied for state claims in this action is that of Illinois. The relevant statute governing the trade secret misappropriation cause of action is the Illinois Trade Secrets Act. Ill. Rev.Stat. ch. 140, para. 352. An examination of the definition of "trade secret" in that Act reveals that plaintiff has met its burden of demonstrating that there exist triable issues of fact that preclude summary judgment.

Three components of the definition of "trade secret" are at issue here: (1) whether sufficient steps were taken to lead a reasonable person to believe that the material sought to be protected was confidential; (2) whether the material claimed to be a trade secret has any economic value; and (3) whether the material qualifies as a "secret." The Illinois Trade Secrets Act expressly states that a "trade secret" encompasses:

information, including but not limited to, technical or non-technical data, a formula,

pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure and use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

Ill.Rev.Stat. ch. 140, para. 352(d).

### A. *Was SCM Treated Confidentially?*

Defendant has stated that Tollaksen's program was not confidential, was not of economic value, and did not constitute a "trade secret." Defendant points out that Tollaksen demonstrated SCM to Eustace despite Eustace's refusal to sign the confidentiality agreement proffered by Tollaksen. Plaintiff, however, as indicated above, alleges that Eustace, upon declining to sign the agreement, stated that "the confidentiality agreement would be part of whatever business agreement was eventually worked out." Pl.'s Mem.L.Opp'n Mot.Summ.J. at 6. Thus, whether or not Tollaksen conditioned his work for defendant on the defendant maintaining confidentiality of SCM is a triable issue of fact.

### B. *Does SCM Have Economic Value?*

■ Defendant has stated that "plaintiff has offered no evidence that SCM is a commercially viable software product." Def.'s Rep.Mem.L.Supp.Mot.Summ.J. at 19. The fundamental flaws in this claim are that (1) the Illinois Trade Secret Act specifically states that it is sufficient that the information sought to be given trade secret protection has *potential* economic value, and (2) defendant's own course of conduct in pursuing negotiations for a licensing agreement with Tollaksen to integrate SCM into its own TAM program or to market SCM as a stand-alone product belies its claim that SCM has no economic or potential economic value. Defendant paid plaintiff $8,500.00 for work on integrating SCM with TAM. It is reasonable to infer that defendant would not have done this had it not believed that there were at least potential economic value in SCM.

Finally, defendant expresses its belief that plaintiff sold four or five copies of SCM at $700.00 per copy. Def.'s Mem.L.Supp.Mot. Summ.J. at 5 (citing Dep. of John DeVries, Mar. 2, 1994). The Court thus finds that there was at least potential economic value in plaintiff's SCM program such that defendant is not entitled to summary judgment on the trade secret misappropriation claim.

### C. *Was SCM "Secret"?*

Defendant also argues that plaintiff has not specifically identified the trade secrets that defendant allegedly misappropriated. Plaintiff has put forth in an appendix attached to its complaint what it believes to be trade secrets that were disclosed to defendant during the course of plaintiff's work at defendant's headquarters. Pl.'s App. A, B. Whether or not these are trade secrets constitutes a material question of fact that precludes summary judgment. Defendant itself acknowledges that this is a question of fact by claiming, "*[N]one* of the items which plaintiff has designated as a 'trade secret' is a trade secret *in fact*." Def.'s Mem.L.Supp. Mot.Summ.J. at 25 (second emphasis added). The Court lacks the technical expertise to evaluate on its own whether the information plaintiff claims is secret is, in fact, not generally known in the industry. An expert's testimony would likely be necessary, and defendant is therefore not entitled to judgment at this juncture. Further, case law supports the proposition that the overall *design* of a software program may be protectable as a trade secret, even if the individual *components* of that program are common knowledge in the programming industry. *Computer Care v. Service Sys. Enters.*, 982 F.2d 1063, 1074 (7th Cir.1992) (" 'A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process design and operation of which in unique combination affords a competitive advantage and is a protectable trade secret.' " (quoting *SmokEnders, Inc. v. Smoke No More, Inc.*, 184 U.S.P.Q. 309, 317, (BNA), Civ. No 73-1637, 1974 WL 20234 (S.D.Fla. Oct. 21,

1974))). As explained by plaintiff, finding otherwise would, by analogy,

> mean that a novel written in English cannot be protected unless the novelist has invented new words or rules of grammar.... [A]ny computer programmer must work with the tools that he [or she] is given, which are determined principally by the computer language in which he [or she] is working (not unlike the grammatical and linguistic restrictions of any language). It is what the programmer does within those constraints that creates protectable intellectual property.... [I]t is the *design* of the program that is the most important, not the particular code that reflects that design.

Pl.'s Mem.L.Opp'n Mot.Summ.J. at 20 (citation omitted).

■ The determination as to whether or not the design of a software program can be considered a trade secret depends on several factors, including whether the information "can be readily duplicated without involving considerable time, effort or expense." *Hamer Holding Group, Inc. v. Elmore*, 202 Ill. App.3d 994, 148 Ill.Dec. 310, 321, 560 N.E.2d 907, 918 (1990); *Service Ctrs. of Chicago, Inc. v. Minogue*, 180 Ill.App.3d 447, 129 Ill.Dec. 367, 370–71, 535 N.E.2d 1132, 1135–36 (1989). If the answer to that inquiry is "no," then the information can be classified as a protectable secret. *Id.* Plaintiff has cast doubt on defendant's argument that SCM in itself was not a secret by explaining that it took six years to develop. Here, there is a dispute as to whether or not SCM's component parts, the design of the program itself, or both constitute protectable trade secrets within the meaning of the Illinois Trade Secret Act.

### V. *REMAINING CLAIMS*

#### A. *Fraud and Unfair Competition*

■ Plaintiff's causes of action for unfair competition and fraud are similarly precluded from summary judgement. The record supports plaintiff's claims. For example, defendant states that before it had any contact with Tollaksen, defendant had *already* come to the conclusion that it was probably not feasible to integrate any third party software program into its own TAM program. Def.'s Mem.L.Supp.Mot.Summ.J. at 6. Drawing reasonable inferences in favor of plaintiff, the non-moving party, it can be inferred that defendant never intended to bring plaintiff to its headquarters for the purpose of compensating him for its ultimate planned use of SCM, either in conjunction with TAM or as a stand-alone product.

Although defendant states that Eustace, who knew nothing about computer programming, decided to put the conclusion of his own programming staff aside and engage Tollaksen for the purpose of integrating the programs anyway, this does not seem credible. At best, it raises a question of fact as to whether defendant engaged plaintiff in bad faith, breaching a relationship of trust. While defendant also states that it was considering marketing SCM as a "stand-alone" product, Def.'s Mem.L.Supp.Mot.Summ.J. at 7, defendant contradicts itself by later stating that the SCM program was too slow and that it doubted SCM's economic value. Finally, to refute allegations that it copied plaintiff's SCM program, defendant states that it merely wanted to adopt some of SCM's features. In the face of such contradictory statements, it is entirely reasonable to infer that defendant brought plaintiff to its headquarters under false pretenses, breaching a duty of trust and confidence.

This possibility is further borne out by the fact that, after spending $8,500.00 for plaintiff to work on the integration of the two programs, defendant abruptly broke off negotiations with plaintiff because one of the searches on SCM was executed too slowly, and refused to allow plaintiff to fix this problem. This raises a triable issue of fact as to why defendant sought plaintiff's help in integrating the two programs but suddenly halted negotiations with plaintiff. Because of such questions as to allegations of breach of trust, plaintiff's claims of unfair competition and fraud are not amenable to summary judgment at this time.

#### B. *Lanham Act Violation*

Defendant has included the Lanham Act, 15 U.S.C. § 1125(a), cause of action in its sweeping motion for summary judgment, yet

does not put forth evidence as to why it is entitled to judgment on this cause of action. The Court therefore denies summary judgment with respect to this cause of action as well.

### C. *Unjust Enrichment*

As to plaintiff's claim of unjust enrichment, to the extent that it depends on the disposition of the substantive claim of trade secret misappropriation, it too is precluded from summary judgment.

## VI. *CONCLUSION*

For the above reasons, defendant's motion for summary judgment is hereby DENIED in its entirety.

**SO ORDERED.**