**TOUCHPOINT SOLUTIONS, INC., Plaintiff,**

v.

**EASTMAN KODAK COMPANY, Defendant.**

**No. CIV.A. 04–11014–NMG.**

United States District Court, D. Massachusetts.

Oct. 13, 2004.

Robert B. Calihan, Nixon Peabody LLP, Boston, MA, for Eastman Kodak Co., Defendant.

H. Joseph Hameline, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, MA, for TouchPoint Solutions, Inc., Plaintiff.

Nicholas G. Papastavros, Nixon Peabody, LLP, Boston, MA, for Eastman Kodak Co., Defendant.

## MEMORANDUM & ORDER

GORTON, District Judge.

This motion arises from a claim for trade secret misappropriation filed on May 19, 2004. Plaintiff TouchPoint Solutions, Inc. ("TouchPoint") alleges that defendant Eastman Kodak Company ("Kodak") misappropriated the design of TouchPoint's "Catapult" software package ("Catapult") in violation of trade secret law. TouchPoint now moves for a preliminary injunction pursuant to Fed.R.Civ.P. 65.

### I. *Factual Background*

The following facts are taken from plaintiff's memorandum in support of the motion for a preliminary injunction (Docket No. 25), defendant's opposition memorandum (Docket No. 36) and supporting exhibits to both memoranda (Docket Nos. 26, 27, 29, 30, 31, 32, 33, 34).

*Kodak's Relationship with TouchPoint*

Plaintiff TouchPoint is a software company with 40 employees. Catapult, which was developed by TouchPoint, is a "remote management software" ("RMS") package designed to control a network of computers from one central "server". In its "out-of-the-box" state, Catapult consists of a "shell" (of source code) that, with a high degree of generality governs the interactions between individual computers in the network and the server. TouchPoint tailors that shell (with more specific source code) to meet a client's individual needs.

Defendant Kodak maintains "Picture Maker Digital Kiosks" ("kiosks") in stores throughout the country. The kiosks allow a consumer to manipulate his/her photograph digitally. The kiosks are not connected to a server or network, so that if a kiosk requires a repair or software update, a repair visit to the site is necessary. Kodak sought to use RMS to supervise its kiosks remotely.

Kodak became interested in Catapult at a trade show in March, 2003. On March 27, 2003, Kodak gave TouchPoint a two-page "requirements matrix," very roughly specifying the functionality of the RMS that Kodak would require.

TouchPoint representatives traveled to Kodak headquarters on April 3, 2003 to discuss Catapult with Kodak. Those representatives suggested that the parties use TouchPoint's pre-printed Confidential Disclosure Agreement, which would have allowed for the oral designation of confidential information. Kodak insisted on using its own pre-printed Confidential Disclosure Agreement ("the CDA") instead. The parties signed the CDA, Section 7 of which

limits its coverage to material that is identified in writing as being confidential. Section 5 of the CDA defines TouchPoint's confidential information as consisting of "Catapult Enterprise software platform for distributed, managed network, [to] securely deploy, manage, monitor and monetize application content on remote devices."

In June, 2003, TouchPoint commenced a series of technical presentations to Kodak about Catapult. In several instances, TouchPoint provided Kodak with allegedly confidential information, including the TouchPoint Users Guide, without designating in writing that the information was confidential. Kodak installed a demonstration copy of Catapult on a computer and thereby accepted TouchPoint's click-through "End User License Agreement" ("the EULA"). The EULA imposed confidentiality and other restrictions on the use of Catapult.

On September 3, 2003 the parties began a pilot program to test Catapult on kiosks in Eckerd Drugstores in Atlanta, GA. In preparation, TouchPoint added measures to protect its confidentiality including password-protecting access to Catapult's server and the appointment of a "gatekeeper" for its confidential information. The pilot ended on November 3, 2003 and Kodak engineers apparently were favorably impressed by Catapult. One engineer speculated that it would take Kodak "1.5 years to get to the same point TouchPoint is at now".

During December, Kodak developed a "requirements matrix" ("December Matrix") and a "marketing requirements document." Those documents detailed the design and specifications of the RMS that Kodak would ultimately require. Because Kodak was working with TouchPoint to acquire that RMS, the documents were tailored to the functionality of Catapult.

For the next three months, TouchPoint continued to share information about Catapult with Kodak, at times answering up to 15 requests per day for technical information. TouchPoint continued to provide allegedly confidential information without always labeling it in writing as confidential. Kodak began to develop a "Products Requirements Document" ("PRD") under the direction of its Chief Engineer, Michael Malec. He visited TouchPoint facilities where TouchPoint personnel helped to refine the PRD. The PRD evolved into a 43–page document intimately detailing the specifications of the software that Kodak would require. The document referred to Catapult approximately 140 times and TouchPoint contends that it contained TouchPoint trade secret information. Kodak responds that the PRD was based solely on Kodak's own information and needs.

On April 8, 2004, the parties ceased daily communication after Kodak concluded that the cost of implementing TouchPoint would be too great. TouchPoint filed suit on May 19, 2004.

*Kodak's Relationship with IBM*

While working with TouchPoint, Kodak was also negotiating with IBM concerning RMS, allegedly to "build a replica of [Catapult]." On January 22, 2004, Kodak gave IBM the December Matrix. For the following two months, several Kodak engineers worked simultaneously with TouchPoint and with IBM.

On April 8, 2004, Kodak gave IBM a "sanitized" PRD. That PRD was the same as the Catapult-related PRD, except that it had been stripped of all references to Catapult. Through that PRD, the December Matrix, the simultaneous assignments of Kodak engineers to the IBM and TouchPoint projects and a series of meetings between Kodak and IBM, TouchPoint al-

leges that Kodak conveyed TouchPoint's confidential information to IBM.

*Kodak's Internally Developed RMS*

Kodak was also internally developing RMS but the parties disagree on when that work commenced or bore fruit. Kodak alleges that it already had a mature RMS project when TouchPoint negotiations began. In fact, Kodak asserts that it had been researching RMS since the 1970s but TouchPoint responds that Kodak developed RMS technology much later and that Kodak's RMS is a "direct lineal descendant" of Catapult.

During the design process at Kodak, several of the engineers that were assigned to work on Catapult were also assigned to work on Kodak's RMS. Additionally, Kodak stored allegedly confidential information about Catapult in a computer database that was generally available to Kodak employees. As a result of that database and the overlapping duties of engineers, TouchPoint contends that confidential information concerning Catapult was incorporated into Kodak's RMS.

TouchPoint cites similarities in the functionality of Catapult and Picture Maker 4.0, one of Kodak's RMS packages. TouchPoint also alleges, in essence, that Kodak's development of its RMS package proceeded far too quickly for it to have been independently created. Finally, TouchPoint has produced an email sent from Kodak Engineer Tom Pinkham to other Kodak engineers instructing them to sit down with an engineer from the Catapult project to learn about its various features.

TouchPoint now moves for a preliminary injunction to prevent Kodak from "using or disclosing TouchPoint's confidential information." More specifically, TouchPoint seeks to enjoin Kodak from entering the RMS field.

## II. *Legal Analysis*

### A. Preliminary Injunction Standard

To merit a preliminary injunction under Fed.R.Civ.P. 65(a), the moving party must show: 1) a likelihood of success on the merits, 2) irreparable injury, 3) that such injury outweighs any harm to the defendant and 4) that the injunction would not harm the public interest. *Lanier Professional Services, Inc. v. Ricci*, 192 F.3d 1, 3 (1st Cir.1999); *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 220 (1st Cir.1989). The first factor is considered most important. *New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 8 (1st. Cir.2002); *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir.1993).

### B. Analysis

#### 1. *Likelihood of Success on the Merits*

To prevail on a misappropriation claim, a plaintiff must show: 1) the existence of a trade secret, 2) reasonable steps to preserve secrecy, and 3) "use of improper means in breach of a confidential relationship" to acquire the secret. *Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1165 (1st Cir.1994).

##### a. Existence of a Trade Secret

A trade secret may consist of "any formula, pattern, device or compilation of information which is used in one's business, and which [provides] an opportunity to obtain an advantage over competitors who do not know or use it." *Burten v. Milton Bradley Co.*, 763 F.2d 461, 463 (1st Cir.1985). In determining what qualifies as a trade secret, the court considers:

1) the extent to which the information is known outside of the business; 2) the extent to which it is known by employees and others involved in the business; 3) the extent of measures taken by the

employer to guard the secrecy of the information; 4) the value of the information to the employer and to his competitors; 5) the amount of effort or money expended by the employer in developing the information; and 6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *American Science and Engineering, Inc. v. Kelly,* 69 F.Supp.2d 227, 238 (D.Mass.1999) (quoting *Rest. (Second) of Torts* § 727).

■ For software, trade secret protection is not limited to the source code. *Harbor Software, Inc. v. Applied Sys., Inc.,* 887 F.Supp. 86, 90 (S.D.N.Y.1995). Rather, the overall design of software can constitute a trade secret. *Id.* ("[I]t is the *design* of the program that is the most important, not the particular code that reflects that design")(emphasis in original). In determining whether a particular software design is protectable, courts focus on whether that design could be duplicated without undue time or expense. *See id.; Hamer Holding Group, Inc. v. Elmore,* 202 Ill.App.3d 994, 148 Ill.Dec. 310, 560 N.E.2d 907, 918 (1990).

■ In the present dispute, Kodak argues that TouchPoint has not sufficiently identified a trade secret. Kodak points out, correctly, that a court is not required to sift through technical data to distill out a trade secret, but rather that the plaintiff must be clear about what information is protectable. *See Julie Research Labs., Inc., v. Select Photographic Eng'g, Inc.,* 810 F.Supp. 513, 519 (S.D.N.Y.1992), *Aff'd in Part,* 998 F.2d 65. Kodak characterizes Catapult as an empty shell that comes to contain trade secret information after it is filled by the client.

TouchPoint responds that Catapult's source code, implementation, overall design and "distributed computing model" are all trade secrets. At oral argument,

counsel for TouchPoint stressed that it brought to Kodak a "mature remote management system" that Kodak had not previously possessed. TouchPoint highlights evidence of Catapult's market advantage and Kodak's interest in Catapult as evidence that it contains information that was not widely known but is valuable.

■ TouchPoint has the more persuasive argument. First, contrary to Kodak's assertion, it is not difficult to discern the nature of TouchPoint's trade secret. It has developed a "client-side" oriented, distributed computing solution to the problem of managing thousands of computers at one time while still maintaining the flexibility to tailor the solution to any network's needs. The design of that unique, complex and apparently valuable solution is protectable. *Hamer Holding Group, Inc.,* 148 Ill.Dec. 310, 560 N.E.2d at 918.

Second, a review of statements of Kodak engineers concerning Catapult demonstrates that Catapult's design provides TouchPoint a distinct competitive advantage not possessed by its competitors. Indeed, even IBM, a major technology company, does not have a RMS solution that is comparable to TouchPoint's. The analysis could end there because the essence of a trade secret is market advantage. *See Burten,* 763 F.2d at 463.

But TouchPoint makes a third compelling argument: Kodak's claims that Catapult contains no trade secret information are undercut by its own interest in Catapult. It is undisputed that, until recently, Kodak's kiosks did not use RMS that resembled Catapult or any other distributed computing model. Kodak's own engineers speculated that it would have taken them 1.5 years or more to develop a package resembling Catapult. When Kodak began negotiating with TouchPoint, Kodak engineers did not act as though Catapult con-

tained only widely available or previously known information. To the contrary, they asked up to 15 technical questions per day of the TouchPoint engineers. Kodak may have been developing RMS for years but the evidence does not suggest that they possessed the mature design that Touch-Point offered.

██ A trade secret need not have the novelty that is requisite for a patent, it must only confer a competitive advantage on its possessor. *See id.* That advantage is clear with Catapult. Accordingly, there is a substantial likelihood that TouchPoint can prove the existence of a trade secret.

### b. Reasonable Measures to Protect Secrecy

██ Plaintiff must also show that it has taken reasonable measures to protect secrecy. *Burten,* 763 F.2d at 463. Courts consider several factors in examining that prong, including: 1) the existence or absence of a CDA, 2) the nature and extent of precautions taken, 3) the circumstances under which the information was disclosed and 4) the degree to which the information has been placed in the public domain or rendered readily ascertainable. *Picker Intern. Corp. v. Imaging Equipment Services, Inc.,* 931 F.Supp. 18, 23 (D.Mass. 1995).

Kodak devotes much of its memorandum to arguing that the CDA should preclude a finding that TouchPoint has taken reasonable steps to preserve the secrecy of its trade secret. Kodak's argument is two-fold:

1) that, if there exists a written CDA, then the Court may not find an implied confidential relationship in addition to it; and

2) because TouchPoint did not follow the terms of the CDA by labeling its information in writing as being confiden-

tial, it has not taken reasonable steps to preserve secrecy.

Concerning the first argument, Kodak asserts that the CDA precludes a finding of an implied confidential relationship between the parties. Section 7 of the CDA reads:

This agreement pertains only to information which is: (a) disclosed in tangible form and clearly labeled as confidential at the time or disclosure, or (b) disclosed initially in non-tangible form and identified as confidential at the time of disclosure and [memorialized as such in writing within 30 days].

It is undisputed that TouchPoint provided some information to Kodak without labeling it as required by Section 7. Kodak contends that any such information was not confidential and therefore could not be trade secret information.

TouchPoint responds by reference to Section 5 of the CDA which defines Touch-Point's confidential information as consisting of:

Catapult Enterprise software platform for distributed, managed network, [to] securely deploy, manage, monitor and monetize application content on remote devices.

TouchPoint argues that Sections 5 & 7 create an ambiguity as to what is considered confidential information because the former is not contingent on a written confidentiality label while the latter is. TouchPoint urges the Court to consider the relationship of the parties in order to determine the scope of the confidential relationship.

Kodak has the better of this particular argument. Sections 5 and 7 can be read unambiguously if they are read conjunctively. Section 5 defines the kinds of information that the CDA could conceivably cover, namely information relating to Cat-

apult. Section 9 confirms that view by providing that anything outside of Section 5 is outside the CDA's coverage. Section 7 specifically limits the CDA's applicability to the subset of "Section 5 information" which is appropriately labeled. The net result is that information unrelated to Catapult is not covered by the CDA, even if it is labeled as being confidential. Accordingly, the CDA pertains only to information that is appropriately labeled.

Nonetheless, the CDA does not preclude a finding that information disclosed without the required designation imposed by Section 7 can be considered confidential. Kodak cites *Knapp Schenck & Company Insurance Agency, Inc. v. Lancer Management Company, Inc.*, 2004 WL 57086 (D.Mass.) for the proposition that the existence of a written CDA precludes a finding of an implied confidential relationship. *Knapp*, however, cannot be read so broadly. In *Knapp*, plaintiff and defendant were involved in negotiations after they signed a CDA. *Id.* at *2. The CDA covered only information that was labeled in writing as being confidential. *Id.* An exchange of information took place without the appropriate labeling and defendant began to use that information, arguing that it was not confidential because it was not labeled as such. *Id.* at *3. Plaintiff sued for misappropriation and breach of the CDA. *Id.*

The Court in *Knapp* granted summary judgment to the defendant on the breach of contract claim but denied summary judgment on the misappropriation claim, specifically holding that "a jury could find that an implied confidential relationship arose between [the parties]." *Knapp*, 2004 WL 57086 at *8. Thus, the court drew a distinction between a claim for breach of a CDA and a claim for misappropriation of trade secrets because, in the latter, the existence of a CDA is just one piece of evidence pertaining to the reasonableness of measures taken to protect secrecy. *See id.*

Moreover, in *Knapp*, even with respect to the breach of contract claim, where the written CDA precluded the existence of an implied confidential relationship, the court explicitly found that the CDA was integrated. *Id.* ("assuming that the [CDA] is to be treated as an integrated document").

Thus, there are two reasons why the *Knapp* decision does not support Kodak's position: 1) the CDA in this case was not integrated and 2) the claim at issue in the pending motion for a preliminary injunction is misappropriation. So, even with a written CDA in place, the Court may examine the conduct of the parties to determine the scope of their confidential relationship and the reasonableness of their efforts to protect secrecy.

That leads to consideration of Kodak's second argument, that TouchPoint's failure to invoke the CDA through appropriate labeling of its information weighs against a finding that TouchPoint has taken reasonable measures to preserve secrecy. Unquestionably, the better practice would have been for TouchPoint to remain utterly faithful to the written protection provision.

But the standard is reasonableness, not perfection. *See Burten*, 763 F.2d at 463. Even though TouchPoint did not faithfully comply with the CDA when it disclosed information to Kodak, the CDA's existence is some evidence of reasonable security measures. *See Picker Intern. Corp.*, 931 F.Supp. at 23 (describing one consideration in finding reasonable precautions as being "the *existence* or absence" of a CDA) (emphasis added). Also, in Section 5 of the CDA, Kodak explicitly agreed that all information concerning Catapult was to be "confidential." Kodak cannot now claim surprise or unawareness of TouchPoint's

intention to conduct a wholly confidential exchange.

TouchPoint also put into place numerous other security measures. The Catapult server was given password protection and a gatekeeper was assigned to monitor the flow of confidential information. Moreover, TouchPoint representatives repeatedly asserted the confidential nature of their disclosures orally. Finally, TouchPoint documented a consciousness of the flow of information. In December, 2003, and again in March, 2004, when the deal appeared to be in jeopardy, it is undisputed that TouchPoint slowed the flow of information and did not permit confidential exchanges to resume until it received assurances that a deal would go forward.

Kodak's response, that compliance or non-compliance with the CDA is dispositive of the reasonableness of security measures, would render the taking of all other precautions pointless. That is not the intent of the preferred inquiry. As the Court aptly stated in *Burten:*

> Where the facts demonstrate that a disclosure was made in order to promote a specific relationship, e.g., disclosure to a prospective purchaser to enable him to appraise the value of the secret, the parties will be bound to receive the information in confidence. 763 F.2d at 463.

The Court finds a likelihood that Touch-Point can prove the existence of reasonable measures to protect the secrecy or its trade secrets.

c. Improper Means of Acquisition

■ The final element of a claim for misappropriation is that the compromised information was obtained through "improper means in breach of a confidential relationship ...." *Data General Corp.*, 36 F.3d at 1165. TouchPoint asserts that its trade secret information was conveyed to both IBM and to RMS project groups within Kodak.

Specifically, TouchPoint alleges that the PRD, containing its confidential information, was transmitted to IBM and was used by engineers developing Kodak's own RMS. TouchPoint also emphasizes that Kodak engineers had overlapping assignments among Catapult, IBM's RMS and Kodak's RMS.

Kodak responds that the PRD contained only information developed by Kodak and that the document was oriented only toward Kodak's needs, rather than TouchPoint's secrets. Kodak further contends that its engineers were interested only in integrating Catapult with Kodak's kiosks, not in learning Catapult's secrets.

In support of its position Kodak offers the opinions of its technical expert, Dr. Lee. Dr. Lee states that the PRD merely describes generally known RMS features. He speculates that if ten software developers were to receive the PRD, ten different software packages would result. The Court does not doubt the truth of that statement but rather the completeness of the inquiry.

A review of the PRD demonstrates that it is intricately tailored to the functionality of Catapult. Kodak admits that Catapult is a superior RMS package. As Kodak became better acquainted with Catapult, its needs seemed to mirror the functionality of Catapult. The PRD served to record that evolving development. It may be that ten software designers would use the PRD to arrive at ten different program solutions, but it appears that all of them would be based on the Catapult solution to the problem of linking and managing thousands of kiosks.

Further, it is clear that Kodak benefitted from learning about the design of Catapult. When Kodak and TouchPoint be-

gan negotiating, Kodak offered only a two-page document specifying its RMS needs. Several months later, the analogous document that it provided to IBM at the beginning of similar negotiations, namely the Catapult PRD, was much longer and more detailed.

It is true that the PRD does not contain "instructions" for how to build Catapult but the PRD does not stand alone. Kodak engineers performed overlapping tasks with respect to Catapult, the IBM RMS and Kodak RMS projects. TouchPoint provides evidence that Kodak engineers intended to incorporate the functionality of Catapult into the Kodak RMS, a feat made easier by the fact that Kodak's widely-available electronic database contained information concerning Catapult. In short, at the very least, the PRD described the capabilities of Catapult and Kodak engineers acquired the know-how to implement them. Because both of those elements were made available to IBM and used internally by Kodak, there is likelihood that TouchPoint can prove Kodak has breached their confidential relationship.

## 2. Balancing of the Harms

The loss of a trade secret is generally found to constitute irreparable harm. *Picker Int'l,* 931 F.Supp. at 44. That is in recognition of the fact that, "once the trade secret is lost, it is gone forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir.1984). Notwithstanding that presumption, injunctive relief is only appropriate where, on the facts before the Court, irreparable harm is threatened. *Lanier,* 192 F.3d at 3.

TouchPoint argues that the harm it would suffer from a misappropriation of its trade secret information is particularly acute due to the size of the company (40 employees) and the importance of Cata-

pult's secrecy in producing a market advantage. It appears that if Catapult were threatened so too would be the existence of TouchPoint. Given that Kodak has already likely shared with IBM at least some information concerning Catapult, TouchPoint's concern is well-founded. Accordingly, the likelihood of harm to Touch-Point without an injunction is great.

Any potential harm caused to Touch-Point by a denial of its motion must be balanced against any reciprocal harm caused to Kodak by the imposition of an injunction. *See id.* TouchPoint seeks to enjoin Kodak not only from disclosing TouchPoint's confidential information but also from entering the RMS field.

To the extent that TouchPoint seeks to enjoin Kodak from sharing TouchPoint's trade secret information with third parties, TouchPoint is on firm ground. Kodak will not incur any harm from such a restriction.

Moreover, it is unlikely that monetary damages will suffice to compensate Touch-Point if its trade secrets become known to third parties. To the extent that irreparable harm is presumed in a trade secret case, that presumption refers to such damage as would be caused by the disclosure of the secret to the industry. *See FMC Corp.,* 730 F.2d at 63. Accordingly, the balance of harms tips in TouchPoint's favor to the extent of enjoining Kodak from disclosing TouchPoint's trade secrets to third parties.

To assure such non-disclosure, Kodak must segregate TouchPoint's confidential information from any of its programs and avoid conveying such information to any third party. That segregation must include a restriction against Kodak engineers who have come into contact with confidential Catapult information from working with parties outside Kodak on RMS. Finally, because it is likely that Ko-

dak has already conveyed confidential information to IBM, Kodak will be prohibited altogether from dealing with IBM in connection with RMS. In fact, in its papers, Kodak has conceded that, if any injunctive relief is found to be necessary, the measures described above would be appropriate.

TouchPoint also seeks to enjoin Kodak from entering the RMS field of business on the grounds that the confidential information acquired about Catapult has given Kodak an unfair advantage in the development of its RMS. Thus, in order to prevent Kodak's use of TouchPoint's trade secret information altogether, TouchPoint contends it is necessary to enjoin Kodak from entering the field of RMS.

If Kodak were, however, enjoined from entering the remote management software business, it would suffer great harm. Kodak has spent time and money developing RMS and integrating that technology with its kiosks. Unavoidably, an injunction covering all RMS would render those investments worthless. In its memorandum, Kodak cites a decline in its traditional photo business and the need to offset it with digital technology. The Court does not doubt that assertion. Enjoining Kodak's exploitation of all RMS business is unwarranted under the prevailing circumstances.

On the other hand, it is unclear whether TouchPoint would suffer any harm as a result of Kodak's internal use of confidential Catapult information. Even assuming that Kodak has incorporated TouchPoint's trade secrets into its RMS, monetary damages would compensate TouchPoint in the same way as the contemplated contract would have. TouchPoint was prepared to divulge its trade secrets to Kodak in exchange for license fees or a lump sum and therefore, cannot claim irreparable harm if precisely that arrangement prevails after trial. Thus Kodak will not be enjoined from entering the RMS field nor its engineers from continuing to work on internal RMS projects.

**ORDER**

In accordance with the foregoing, TouchPoint's motion for a preliminary injunction (Docket No. 4) is **ALLOWED**, in part, and **DENIED**, in part. TouchPoint shall submit to the Court on or before October 20, 2004, a proposed preliminary injunction consistent with this Court's Memorandum and address, in accompanying papers, the issue of posting of a bond pursuant to Fed.R.Civ.P. 65(c). Kodak may submit a proposed, alternative injunction on or before October 27, 2004.

**So ordered.**